**CONTINUATION OF A CRIMINAL COMPLAINT AND
APPLICATIONS FOR SEARCH WARRANTS**

I, Benjamin Glynn, being duly sworn, state as follows:

## I.    Introduction

1.    I am an FBI Special Agent, United States Department of Justice.  I am currently assigned to the St Joseph Resident Agency in FBI's Detroit Field Division.  I have been employed with the FBI since January 2017.  Prior to being employed with the FBI, I was a police officer and investigator with the Rock Hill Police Department in Rock Hill, South Carolina, starting in February 2011.  During my time as a Special Agent and investigator, I have led and participated in multiple investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and the interception of wire and electronic communications.  Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of drug proceeds, and the dialect, lingo, and coded language used by drug traffickers.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to drug trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to 21 U.S.C. §§ 841, 843, 846, 848, 952, and 963, as well as money laundering laws, 18 U.S.C. §§ 1956 and 1957.

2.    I am personally involved in the investigation of the offenses referred to below.  In addition to my personal knowledge, the statements contained in this continuation are based in part on:

a.      information provided by FBI and DEA agents and task force officers,

investigators from the Kalamazoo Valley Enforcement Team ("KVET") and

Southwest Enforcement Team ("SWET"), and other law enforcement officials,

including oral and written reports that I have received directly or indirectly from

law enforcement officials;

b.      interviews with confidential sources;

c.      results of physical surveillance conducted by law enforcement officers, which

have been reported to me either directly or indirectly;

d.      a review by myself and other law enforcement officers and law enforcement

analysts of telephone toll records, and pen register, trap and trace, and subscriber

information;

e.      consensually recorded telephone calls and text messages;

f.      records from the National Law Enforcement Telecommunications System;

g.      the Court-authorized interception of wire and electronic communications over two

telephones with the numbers (269) 332-4009 ("**TARGET PHONE 1**"), and (213)

434-7111 and (213) 760-0160 ("**TARGET PHONE 2**"), authorized under 18

U.S.C. § 2518;

h.      my training and experience as an FBI Special Agent;

i.      the training and experience of law enforcement officers with whom I have spoken

regarding this investigation, or whose reports I have reviewed.

3.      Because this continuation is for the limited purpose of establishing probable cause

to support the criminal complaint, the issuance of arrest warrants against the proposed

2

defendants, and the issuance of search warrants against the proposed **Subject Premises**, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this continuation.

4.      Since June 2017, investigators with SWET, KVET, DEA, and FBI have conducted a joint investigation into RAYMOND DEMETRIUS STOVALL and RICHARD LEE JAMES JR. and their involvement in the distribution of large quantities of methamphetamine in southwest Michigan, including Kalamazoo and Berrien Counties.

5.      Law enforcement has identified STOVALL as the leader of the crystal methamphetamine drug-trafficking organization ("DTO") operating in Kalamazoo and Benton Harbor, Michigan. KENTRELL DUNN of Phoenix, Arizona, is supplying STOVALL with the methamphetamine, according to law enforcement's analysis of toll records, money transfers, confidential informants, electronic surveillance, physical surveillance, and other investigative means. This investigation has revealed that STOVALL coordinates with DUNN to receive methamphetamine shipments in southwestern Michigan. STOVALL then coordinates with other co-conspirators to pick up the shipments and distribute the methamphetamine from the shipments in pound or multiple-ounce quantities within southwestern Michigan. STOVALL has a criminal history that includes two state convictions for felony controlled substance-possession of methamphetamine/ecstasy, both in 2007, and felon in possession of a firearm, in 2013.

6.      Law enforcement has identified JAMES as the second-in-command for the DTO. JAMES has distributed multi-ounce quantities of methamphetamine to a confidential informant (such informants are generally referred to herein as "CI") and an undercover officer (undercover officers are generally referred to herein as "UC"). JAMES assists with picking up and

3

distributing packages of methamphetamine.  JAMES primarily operates out of the Kalamazoo area.  JAMES has a state conviction for domestic violence in 2014.

7.    Over the course of this investigation, investigators have identified the members of the DTO, including the following co-conspirators: RAYMOND DEMETRIUS STOVALL, a/k/a "OG," RICHARD LEE JAMES JR., a/k/a "Lopez," a/k/a "Blow Pack," a/k/a "Cheese," a/k/a "Blow Cheese," KENTRELL TEROME DUNN, a/k/a "Squeeze," a/k/a "Teddy," DAVID RICHARD UMINN, ANDREW PETER BAGLEY, ROBERT BRUCE ARMSTRONG, KANDY KAY KIRBY, ESHAWN JAMIER WHITESIDE, a/k/a "Boont," a/k/a "Boontha," AARON EARL RIMPSON, DEMICHAEL MISHAUN HORN, a/k/a "D-Mike," MICHAEL DEWAYNE HORN, a/k/a "Benji," SCOTTY DEANDRE-MARCUS CAMPBELL, RONALD EUGENE GOODLOE JR., a/k/a "Rocky," a/k/a "Rock Star," RICHARD FARMER SR., DAISY LAVERNE DYER,  MICHAEL JOHN MARCON, a/k/a "Mikey," RONNIE DEVAL SMITH JR., a/k/a "Nun," a/k/a "Nun Nun," and TREMAIN LAMAR BRAXTON, a/k/a "Smile Dog."  I respectfully submit that, as detailed below, there is probable cause to believe that these individuals, conspired with each other, and with others known and unknown, to knowingly and intentionally distribute and possess with intent to distribute 50 grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, except as to RICHARD FARMER SR., for whom there is probable cause to believe he conspired as described above, but I make no allegation at this time as to the quantity of methamphetamine involved, and therefore submit only that there is probable cause to believe he has violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846.

8.    Although the conspiracy primarily involves methamphetamine, various DTO members have also conspired with each other, and with others known and unknown, to distribute

4

and to possess with intent to distribute other controlled substances, including MDMA, a Schedule I controlled substance, heroin, a Schedule I controlled substance, and codeine, either a Schedule II or Schedule III controlled substance (as discussed below), also in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846, as detailed in part below.  Additionally, all of the methamphetamine referenced herein has been visually identified as crystal methamphetamine. Some of the seized methamphetamine has been tested for purity, and those tests have indicated the methamphetamine was 98% or 99% pure.

9.      For ease of reference, an index with the pages on which information about each of the proposed defendants can be found is located at the end of this continuation.

10.      This continuation is also made for the purpose of establishing probable cause in support of search warrants for the properties listed below for evidence of the conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 846:

   a.    612 Locust Street, Kalamazoo, Michigan, which is a primary distribution location for the DTO ("**Subject Premises 1**");

   b.    3327 Dearborn Avenue, Kalamazoo, Michigan, which is DAVID UMINN's residence ("**Subject Premises 2**");

   c.    6244 Wright Street, Kalamazoo, Michigan, which is ROBERT ARMSTRONG's residence ("**Subject Premises 3**");

   d.    973 Lavette Street, Benton Harbor, Michigan, which is RICHARD JAMES's residence ("**Subject Premises 4**");

   e.    4001 Lakesedge Drive, Apartment E, Kalamazoo, Michigan, which is INDIVIDUAL A's residence ("**Subject Premises 5**");

    f.        826 Woodbury Avenue, Kalamazoo, Michigan, which is ESHAWN

WHITESIDE's residence ("**Subject Premises 6**");

    g.        4420 Lilac Lane, Building B, Apartment 143, Kalamazoo, Michigan, which is

AARON RIMPSON's residence ("**Subject Premises 7**");

    h.        4259 Lakesedge Drive, Apartment A, Kalamazoo, Michigan, which is MICHAEL

MARCON's residence ("**Subject Premises 8**");

    i.        5175 Collingwood Avenue, Kalamazoo, Michigan, which is ANDREW

BAGLEY's residence ("**Subject Premises 9**");

    j.        744 Liberty Street, Apartment C1, Kalamazoo, Michigan, which is KANDY

KIRBY's residence ("**Subject Premises 10**"); and

    k.        556 Sherman Court, Benton Harbor, Michigan, which is RAYMOND

STOVALL's residence ("**Subject Premises 11**").

11.    **Subject Premises 1** through **11** are referred to collectively as the **Subject Premises**, and each is further described in the Attachment A to the respective search warrant application. The items to be seized are described in Attachment B to each application.

12.    I know from training and experience that subjects involved in drug trafficking often use their residences to store drugs and otherwise further their drug trafficking. Drug traffickers frequently maintain quantities of drugs in their places of residence, along with packaging materials, scales for weighing drugs, and rubber or latex gloves to prevent the transfer of fingerprints and/or the contamination of drugs. Subjects also tend to keep currency, i.e., the proceeds of drug trafficking, and ledgers, notebooks, and other documentation whereby they track their purchases and sales of controlled substances. In addition to hard copy documents, drug traffickers often maintain records of their activities on electronic equipment such as

computers and "tablet" mobile computing devices.  Many, if not most, financial institutions now provide software applications ("apps") to their customers which permit the rapid movement of funds between and among financial accounts.  Drug traffickers who move money through financial institutions to buy and sell drugs now may do so using home computers and tablet devices.

13.     I also know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates.   Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of drugs, co-conspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

14.     Lastly, to protect against theft, drug traffickers frequently keep firearms and ammunition on or about premises where they store drugs, currency, or other items of value. Because drug traffickers cannot report the theft of drugs, drug proceeds, or other items of value to law enforcement without substantial risk of their illicit activities being discovered, they themselves must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

15.     Further, based upon my training, experience, and participation in financial investigative aspects involving large amounts of controlled substances, I am aware of the following:

a.     Drug traffickers often purchase or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies.

b.     Even though these assets are in names other than the drug traffickers', the traffickers actually own and continue to use these assets, and exercise dominion and control over them.

c.     Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going drug business.

d.     It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, and receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  These books, records, receipts, notes, and ledgers, are maintained where the traffickers have ready access to them, including their residences.

e.     It is common for drug traffickers to secrete contraband, proceeds and records of drug transactions in secure locations within their residences, businesses, vehicles, or other locations which they maintain dominion and control to ensure ready access to these items and to conceal them from law enforcement authorities; subjects involved in drug trafficking often have unexplained wealth and assets as they do not have jobs, nor do they report income on their state or federal tax

returns.  Subjects often use cash, money orders, cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets.

f.      In order to accomplish this concealment, drug traffickers have built "stash" places within their residences, businesses, or vehicles for these items.

g.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, vehicles, or other locations over which they maintain dominion and control.

h.      Drug traffickers often utilize electronic equipment such as computers, facsimile machines, and currency counting machines to generate, transfer, count, record, and store the information.

i.      When drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are

9

not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes, and otherwise legitimate businesses that generate large quantities of currency.

j.    The sale of controlled substances generates large quantities of currency in small denominations (commonly referred to as "street money").

k.    It is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

l.    Small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

m.    Drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny from the Internal Revenue Service or other federal, state, or local agencies.  The "source" of their income reported on tax returns can be falsely stated, misleading, or generic in terms.  Copies of these returns are commonly kept by the traffickers in their residences and businesses.

n.    Drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and telephone numbers of their associates in the trafficking organization.

o.    Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, and they keep these photographs in their possession.

p.    Unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

**II.        Overview of the Investigation**

16.    Beginning in 2017, law enforcement seized substantial quantities of crystal methamphetamine from the DTO.  During the early stages of this investigation, a CI and UC conducted nine controlled purchases of crystal methamphetamine from JAMES, and STOVALL was present during at least one of the transactions.  The total weight of the crystal methamphetamine purchased is approximately 2.4 pounds.

17.    In addition, law enforcement has seized packages of methamphetamine destined to DTO members in Michigan.  On March 19, 2018, the United States Postal Inspection Service ("USPIS") seized a package containing approximately 5 pounds, 15 ounces of crystal methamphetamine.  That package was addressed to INDIVIDUAL A at 4001 Lakesedge Drive, Apartment E in Kalamazoo, MI (**Subject Premises 5**), although INDIVIDUAL A's first name was misspelled on the package.  INDIVIDUAL A, who resides at that address, has rented vehicles, subscribed cellular telephones, and received other drug packages for the DTO.  USPS records indicate that the package was tracked on multiple occasions by (213) 503-1574, the telephone number used by STOVALL at the time of the seizure.

18.    The investigation included the use of Court-authorized interceptions of

conversations over **TARGET PHONE 1**, used by JAMES, and **TARGET PHONE 2**, used by

STOVALL.[1]

### A.    July 3, 2018: JAMES and KANDY KIRBY Conduct a Methamphetamine Transaction

19.    On July 3, 2018, at approximately 9:47 a.m., KIRBY,[2] using (269) 348-6323, sent

a text message (Session #12) to JAMES on **TARGET PHONE 1**, which read: "Hello I'm two

minutes from.  the spot and I'm in need of some cookies a whole box and a quarter of a box."  At

approximately 10:27 a.m., JAMES responded (Session #22): "I'm not there yeti."  At

---

[1] Specifically, the Honorable Robert J. Jonker, Chief Judge of the United States District Court for the Western District of Michigan, ordered 30-day interception periods for **TARGET PHONES 1** and **2**, beginning on July 3, 2018, and ending on August 1, 2018, and also beginning on August 3, 2018, and ending on September 1, 2018.  This continuation relies on recorded communications intercepted pursuant to those orders.  The quoted language in this continuation is taken from careful review of the recorded conversations.  These transcripts are still in preliminary format, and are not intended to be final transcripts or quotations or a full report of each conversation, and are subject to revision upon further review.  At various points in the continuation, I have included my interpretation of words and phrases used in the recorded conversations.  My interpretations are based on the contents and context of the recorded conversation, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents and officers involved in this investigation.

[2] KIRBY was identified as the user of (269) 348-6323 due to Verizon Wireless providing the subscriber of that number as "Kandy Kirby."  Additionally, on July 10, 2018, KIRBY coordinated another purchase of methamphetamine with JAMES through communication between (269) 348-6323 and **TARGET PHONE 1** at approximately 6:00 p.m.  At approximately 6:07 p.m., SWET investigators observed KIRBY arrive at 922 S. Park Street in Kalamazoo to finalize the purchase, a location that had been identified by law enforcement as used by the DTO to distribute drugs.  In addition to this methamphetamine purchase, KIRBY has also conducted multiple other multi-ounce purchases of methamphetamine in the DTO, typically coordinating these purchases with either JAMES or STOVALL through either **TARGET PHONE 1** or **TARGET PHONE 2**.  Some, but not all, purchases have been further corroborated through surveillance by law enforcement.

approximately 10:27 a.m., KIRBY replied (Session #23): "Ok how long."  At approximately

10:28 a.m., JAMES replied (Session #24): "Like 30 mins."  At approximately 10:28 a.m.,

KIRBY replied (Session #25): "Ok."

20.    Based on my training, experience, and knowledge of the investigation, I believe

that KIRBY and JAMES were discussing the purchase of approximately an ounce and a quarter

of methamphetamine.  Specifically, KIRBY was using "cookies" as a code word for

methamphetamine, and "box" as a code word for an ounce.

### B.    July 3, 2018: STOVALL and AARON RIMPSON Coordinate a Methamphetamine Transaction

21.    On July 3, 2018, while conducting electronic surveillance of **TARGET PHONE**

**2**, used by STOVALL, investigators intercepted a conversation (Session #38) between

STOVALL and RIMPSON, using (269) 447-4521.[3]  The call occurred at approximately 5:12

p.m.  The following is the transcription of the call:

RIMPSON:        See I got that little bread, I'ma bring that little bread to
                you . . . shit and uh . . .

STOVALL:        You got it though?

---

[3] The subscriber for telephone number (269) 447-4521 is "Aaron Rimpson" residing at 4420 Lilac Lane in Kalamazoo, Michigan.  In addition, when this number was searched through Facebook, it provided a return of Facebook user "Earl Rimpson," the publicly available Facebook page apparently belonging to RIMPSON based on content posted on the page. Additionally, investigators have intercepted calls from the user of the 4521 number setting up a meeting with JAMES or STOVALL that coincided with RIMPSON or his vehicle then being observed on surveillance meeting up with JAMES or STOVALL.  In addition to this methamphetamine transaction, RIMPSON has also conducted multiple other purchases of an ounce of methamphetamine from leaders of the DTO, typically coordinating these purchases with either JAMES or STOVALL through either **TARGET PHONE 1** or **TARGET PHONE 2**. Some, but not all, purchases have been further corroborated through surveillance by law enforcement.

RIMPSON:        Who me?

STOVALL:        Yeah.

RIMPSON:        Yeah.

STOVALL:        Yeah man . . . sure need it man.  I, I, I, I need to do something.  I
                need to send it off real quick, send 500 off.

RIMPSON:        Uh, Alright.

STOVALL:        If you can just let me know . . . you can do that, man.  I mean
                you can get somebody to do that.

RIMPSON:        Alright you ain't got no more do you?

STOVALL:        Yeah, yeah.

RIMPSON:        Alright, shit, He prolly want, I think he want four of them
                though.

STOVALL:        He can get them bitches, man.

RIMPSON:        Alright.

STOVALL:        Yeah.

22.    Based on my training, experience, and knowledge of the investigation, I believe

that RIMPSON owed STOVALL $500 for methamphetamine and agreed to pay STOVALL.

RIMPSON then asked STOVALL if he had any more methamphetamine and STOVALL

acknowledged he did.  RIMPSON then informed STOVALL that a third-party would like four

ounces and STOVALL confirmed he had the four ounces.

14

    **C.**    **July 6, 2018: Surveillance and Intercepted Communication Pertaining to Two Package Deliveries**

23.    On July 6, 2018, while conducting electronic surveillance of **TARGET PHONE 2**, used by STOVALL, investigators intercepted a call between DAISY DYER, using (269) 929-0423,[4] and STOVALL.  The call (Session #430) occurred at approximately 10:03 a.m. The following exchange took place during the conversation:

| | |
|---|---|
| DYER: | Whatcha doing? |
| STOVALL: | Just chillin' right now. |
| DYER: | Um, you get that dope? |
| STOVALL: | Shi, Shi, Shit, Shi, Shit, I was 'bout to tell you don't forget that's coming [U/I].[5] |

---

[4] The subscriber for telephone number (269) 929-0423 is INDIVIDUAL B at 637 Carr Street, Kalamazoo, Michigan 49001.  INDIVIDUAL B is DYER's 19-year-old daughter, who lives with DYER.  According to a commercial database (Accurint), DYER is associated with the 637 Carr address.  Furthermore, according to a Facebook post, on July 15, 2018, on the apparent Facebook account of INDIVIDUAL B (the username for which is the first and middle names of INDIVIDUAL B), the user of the account wrote, "Thanks to mommy for making everything happen today, she allwaaaaays come thru regardless" and the only person that was tagged was DYER.  Also, on DYER's apparent Facebook account, she has posted that the user of INDIVIDUAL B's apparent account is her daughter.  Additionally, investigators intercepted a call (Session #754) on July 7, 2018, between (269) 929-0423 and JAMES, using **TARGET PHONE 1**.  The user of the 0423 number had a female voice.  During the call, someone in the background of the call said "is that Daisy?" just before JAMES was going to speak.  The female caller then said, "Who is that talking bout, is that Daisy?"  JAMES then said, "Boontha," which is a nickname used by ESHAWN WHITESIDE.  Based on these facts, I believe that the user of telephone number (269) 929-0423 is DAISY DYER.

In addition to being involved in the receipt of a package of methamphetamine as detailed below, DYER has also transported STOVALL and JAMES to conduct drug transactions.  For instance, on June 7, 2018, prior to the initiation of the electronic surveillance, DYER transported STOVALL and JAMES in her rental vehicle to deliver two ounces of methamphetamine to the UC.

[5] [U/I] is shorthand in the transcripts for "unintelligible."

15

DYER:               You say what?

STOVALL:            I said, I said don't forget that's coming today [U/I].

DYER:               Oh, ok.

24.     Based on my training, experience and knowledge of the investigation, it is my belief that when DYER referred to "dope," she was asking STOVALL if he had the methamphetamine.  STOVALL's response was to tell DYER not to forget that a package of methamphetamine was coming in that day.

25.     Again on July 6, 2018, while conducting electronic surveillance of **TARGET PHONE 2**, utilized by STOVALL, investigators intercepted a voice call (Session #459) between KENTRELL DUNN and STOVALL.  The call occurred at approximately 3:36 p.m., with DUNN using telephone number (623) 216-7035.[6]  Below is a transcription of the conversation:

DUNN:               What up fam? [U/I]

STOVALL:            Huh? I can't hear you.

DUNN:               Say what?

STOVALL:            What'd you say?

DUNN:               I thought you said something [U/I] said something.

---

[6] DUNN was identified as the user of (623) 216-7035 in the following manner.  The subscriber of the number is INDIVIDUAL C.  According to American Airline records, INDIVIDUAL C flew with DUNN on July 4, 2018, from Phoenix to Chicago.  INDIVIDUAL C is a female, while the user of the 7035 number has a male voice.  On July 6, 2018, officers observed DUNN leave 922 S. Park Street, after which the user of the 7035 number called STOVALL on **TARGET PHONE 2** to inquire what they were going to do that evening.  Also, STOVALL refers to the user of the 7035 number as "Squeeze," DUNN's nickname according to SWET CI#3, as discussed below.  Finally, on August 6, 2018, INDIVIDUAL C and DUNN were stopped by officers with the Goodyear Police Department in Goodyear, Arizona.  During that traffic stop, DUNN told the officer his phone number was (623) 216-7035.

| STOVALL: | Nah nah, I was going to say hey when you get out this way boy? |
| DUNN: | I might go up that way, I'm bout uh I'll probably, I'll be, I'll probably be there in about 40, 30, 40 minutes. |
| STOVALL: | Alright. |

26.     Based on my training, experience, and knowledge of the investigation, I believe that DUNN and STOVALL were arranging a meeting, which was then observed by physical surveillance.

27.     Later that same day, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a call (Session #557) between INDIVIDUAL D and JAMES.  The call occurred at approximately 3:46 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is the transcription of the conversation:

| JAMES: | Hello. |
| INDIVIDUAL D: | Where you at? |
| JAMES: | I'm still at the mailbox. |
| INDIVIDUAL D: | Oh my God what we going to do? |
| JAMES: | Pull it back up again so I can check it again man, cause, I am, um, just come up here man. |
| INDIVIDUAL D: | I'm about to walk up there. |
| JAMES: | Alright. |

28.     Based on my training, experience, and knowledge of the investigation, I believe that INDIVIDUAL D and JAMES were talking about a package of suspected methamphetamine that had been reported delivered, but they were unable to find the package.  INDIVIDUAL D

was so worried about the package of suspected methamphetamine not arriving, she exclaimed, "Oh my God what we going to do?"

29.    On July 6, 2018, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a voice call (Session #561) between INDIVIDUAL D and JAMES.  The call occurred at approximately 3:57 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is the transcription of the conversation:

> JAMES:        Hello?
>
> INDIVIDUAL D:    Come in the house, why you just walking around.
>
> JAMES:        Shut the fuck up alright I don't want none of that panic shit going on, shut the fuck up or go in the house.

30.    Based on my training, experience, and knowledge of the investigation, I believe that INDIVIDUAL D and JAMES were again talking about the package of suspected methamphetamine that had been reported delivered, but they were unable to find the package and JAMES was trying not to panic.

31.    Later that same day, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a voice call (Session #563) between INDIVIDUAL D and JAMES.  The call occurred at approximately 4:00 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is the transcription of the conversation:

> INDIVIDUAL D:    Hello?
>
> JAMES:        Bring your keys to the [U/I], your car keys and your mail keys.

32.     Based on my training, experience and knowledge of the investigation, I believe that JAMES was still trying to find the package of suspected methamphetamine.

33.     On July 6, 2018, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a call (Session #564) between INDIVIDUAL D and JAMES.  The call occurred at approximately 4:04 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is the transcription of the conversation:

| | |
|---|---|
| JAMES: | Hello? |
| INDIVIDUAL D: | Hello? |
| JAMES: | Call the Post Office and see do I got a package under your name. |
| INDIVIDUAL D: | Which one? |
| JAMES: | The one you got, Portage, what is you talking about, that is where you get your mail at ain't it? |
| INDIVIDUAL D: | It's not as, I'm saying it's UPS, USPS, FEDEX, I don't know which one it is. |
| JAMES: | Shut the fuck up, how, man, listen to me man, call and see do they got a fucking package under your name man. |
| INDIVIDUAL D: | I don't know what the key . . .  it's not, it's not in the mailboxes. [arguing over one another] |
| JAMES: | Go call Portage. |

34.     Based on my training, experience, and knowledge of the investigation, I believe that JAMES wanted INDIVIDUAL D to call the post office in Portage, Michigan, to attempt to find the package of suspected methamphetamine that was addressed in her name.

35.     The USPIS queried the U.S. Postal Service system to further investigate the shipment of methamphetamine.  Investigators located a package of interest that had been sent from the metropolitan Phoenix area in Arizona to Portage, Michigan, with the intended delivery

date of July 6, 2018.  The package was addressed to INDIVIDUAL D at 1525 Bacon Avenue, Apartment 6, Portage, Michigan 49002.  A commercial database check revealed that INDIVIDUAL D resided at 1525 Bacon Avenue, Apartment 6, Portage, Michigan 49002. According to the USPS, the package weight was 5 pounds, 5 ounces.  Based on the calls between INDIVIDUAL D and JAMES regarding the package that was missing and how frantic they were to find it as well as the information about the package coming from a post office in the Phoenix area, I believe the package that initially went missing contained crystal methamphetamine that was destined for the DTO.

36.     USPIS also discovered an additional package of interest.  This package had been delivered to 3510 Comstock Village Lane, Apartment 106, Kalamazoo, Michigan 49048 and had been addressed to INDIVIDUAL E.  The package was sent from the same post office in Arizona as the package sent to INDIVIDUAL D.  INDIVIDUAL E's Facebook page lists DAISY DYER as her mother.  According to the Michigan Secretary of State, INDIVIDUAL E resides at 3510 Comstock Village Lane, Apartment 106, Kalamazoo, Michigan 49048.  According to the USPS, this second package weighed 5 pounds, 13 ounces.  Based on the aforementioned call between STOVALL and DYER and other information to be explained below, I believe the package that was located in the USPS system and destined for the Comstock Village Lane apartment contained methamphetamine.

37.     Investigators intercepted additional calls between JAMES and INDIVIDUAL D, from 4:09 p.m. to 5:19 p.m., regarding the package of suspected methamphetamine, during which JAMES wanted INDIVIDUAL D to call the post office, but she indicated that she would not call until she had the tracking number for the package.

38.      Still on July 6, 2018, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a voice call (Session #588) between INDIVIDUAL D and JAMES, though an unknown male ("UM 1") quickly took over JAMES's end of the conversation.  The call occurred at approximately 5:19 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is the transcription of the conversation:

| | |
|---|---|
| JAMES: | [Before INDIVIDUAL D answers] Man ya'll say ask her what? |
| UM 1: | [In the background] Ask her did she see what numbers on the bottom. |
| JAMES: | Hey, don't it be numbers on the keys that open up the boxes? |
| INDIVIDUAL D: | Yea it tell you which boxes to go to. |
| UM 1: | Hey, Hello? |
| INDIVIDUAL D: | That's why I asked you [U/I] |
| UM 1: | Hey, hey, hey, hey, this ain't, this ain't, no, no, this, this somebody else, hey listen you know when you seent that key in the other box, right? |
| INDIVIDUAL D: | Yea |
| UM 1: | Did you see what number the key was on? Did you see the number on the box where the key was in, the address? Like, the  apartment, like, like, the apartment number on your box? |
| INDIVIDUAL D: | I think, I think it's, I think it's, it's only four of them, I think it, cause two things was delivered out there today because two boxes was already opened. |
| UM 1: | You say two boxes, you seen two boxes, |
| INDIVIDUAL D: | I think it's, [U/I] two of the things was already opened where they come at, where the packages come at . . . |
| UM 1: | Ok, I'm saying, I'm saying, though, ok, hold on man I can't, I can't hear, ok I'm saying you say it's two deliv—I mean, two   packages |

21

come out there, you never know your package could been in the box with, with the, with the key were in somebody else box?

INDIVIDUAL D:    No when something get delivered, they put the key in some box, and you gotta open [U/I]

UM 1:    I know I done went through that before I know what you talking bout, I know, I know exactly what all you talking about, I done went through them steps before already, I'm just saying if you seent the key in somebody else mailbox, your package coulda got caught up with they shit and they, when they delivery that's what I'm saying. You shoulda, you shoulda, yea, you shoulda went to that address—

INDIVIDUAL D:    My key was not in the, it's not certain keys.  When they deliver so they just leave any key and you can open it up.  It's not my, it's not just my key.

UM 1:    I understand it's not

INDIVIDUAL D:    [U/I] It's not like that, it doesn't work

UM 1:    Ma'am, I went through that I understand that just not your key.  I'm saying your package could, your package [interrupted by INDIVIDUAL D] can, can I talk?

INDIVIDUAL D:    What do you mean my key?

UM 1:    I'm just saying that I know that's not your key, I know that's everybody key for delivery I'm saying, your package coulda went in the same box as that key that went to somebody else box.  That's all I'm saying.  It coulda got caught up with somebody else shit.

INDIVIDUAL D:    Yea

UM 1:    That's what I'm saying you shoulda seen what address.

INDIVIDUAL D:    They coulda, they coulda put the key inside somebody else mailbox

UM 1:    That's what I'm telling you, that's what I'm telling you.  You shoulda go to that address, and see what's going on.

INDIVIDUAL D:    All them apartments? Every apartment? I don't know what

UM 1:    Don't go to the apartments, don't go to all the apartments, go to the apartment you seent that key in.  Whatever mailbox you seent that key in to open that box go to them apartments.

22

INDIVIDUAL D:    No it was inside the parcel, it wasn't inside the mailbox.

UM 1:    Inside when?

INDIVIDUAL D:    It was inside the parcel.  We had four parcels where supposed     to get delivered at.  They put the key, they put the key to the parcel inside of our mailbox so we can get our packages.

UM 1:    Ok so why--

INDIVIDUAL D:    Once that key go in there, we can't, you can't take the key out.  It--

UM 1:    Okay if you say--

INDIVIDUAL D:    The thing is already [U/I] what do you mean?

UM 1:    You say what? Hello?

INDIVIDUAL D:    Yea.

UM 1:    You, I, I'm saying if you see all these people.

INDIVIDUAL D:    I don't know what, I don't know what mailbox, or what nothing went.  All I know is the par, it was two parcels had been delivered [U/I] two keys in there.

UM 1:    Well you need to, you need to, you, ma'am, ma'am, you need to, hold on, listen to me, listen to me. You need to find out what's going on.  That's what all, that's what you need to do.  Just knock on somebody door and see what's going on why they key and why your package ain't come.  You need to find out something you need to go back find out something please.  Cause somebody in that building got that, that package and we need it.

INDIVIDUAL D:    Alright.

UM 1:    So we'll be calling you back.  Alright.

39.    Based on my training, experience, and knowledge of the investigation, I believe that JAMES and the unknown male wanted to know where the package was and how INDIVIDUAL D received the key for the parcel box.  Based on the extended conversation about the "keys" and the "parcel" and the "mailbox," I believe that the apartment complex at issue has

an individual mailbox for each apartment, but each mailbox is only large enough to hold mail, not packages.  Packages are delivered to shared, larger parcel boxes, and then the key to the parcel box is placed in the appropriate mailbox, so that the corresponding resident knows that he or she has received a package.  In this call, INDIVIDUAL D was trying to explain this system to the unknown male, who is having trouble grasping it and who urgently wants INDIVIDUAL D to locate the package.  INDIVIDUAL D explained to the unknown male that the package could have been delivered to the wrong apartment because the mail carrier "coulda put the key inside somebody else mailbox."  The unknown male responded, "[y]ou shoulda go to that address, and see what's going on," demonstrating that he did not understand that each resident cannot see inside of the other residents' mailboxes, so INDIVIDUAL D would have no way of knowing where the package was delivered, besides checking "[a]ll them apartments."  After struggling to understand the mail delivery system, the unknown male gave up, ordering INDIVIDUAL D to "find out what's going on."

40.     On that same day, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a voice call (Session #589) between INDIVIDUAL D and JAMES.  The call occurred at approximately 5:28 p.m., with INDIVIDUAL D using telephone number (269) 903-5288.  Below is an excerpt of the conversation:

| | |
|---|---|
| INDIVIDUAL D: | Hello. |
| JAMES: | [INDIVIDUAL D's first name]? |
| INDIVIDUAL D: | What up? |
| JAMES: | You ain't doing no bullshit is you? |

INDIVIDUAL D:    No, Richard you know you told me, shit I don't even take anything out there with me.

JAMES:    Man, my people think you got that shit, mum.

INDIVIDUAL D:    You know I wouldn't do that.

JAMES:    My people want their shit.

INDIVIDUAL D:    Ok, Richard I don't have it.

41.    Based on my training, experience, and knowledge of the investigation, I believe that JAMES was asking INDIVIDUAL D if she had taken the package when he said, "You ain't doing no bullshit is you?" INDIVIDUAL D said that she did not have the package and she had fear in her voice when she said, "You know I wouldn't do that." Given the value of a box of multiple pounds of methamphetamine, the consequences for stealing or losing a box could be substantial, which INDIVIDUAL D appears to recognize in her denial of having stolen the package.

42.    On July 6, 2018, at approximately 5:55 p.m., investigators conducting surveillance on 922 S. Park Street observed JAMES, DEMICHAEL HORN,[7] and

---

[7] Earlier on July 6, 2018, prior to the referenced trip to attempt to locate the package, D. HORN's voice was identified during an intercepted call (Session #595) on **TARGET PHONE 1**. Once D. HORN identified the other party to that call was INDIVIDUAL D, he then passed the phone to an unidentified male who began questioning INDIVIDUAL D about the missing package of methamphetamine. Investigators identified D. HORN as the initial speaker on Session #595 through voice comparison as he has a uniquely high-pitched voice. D. HORN has been identified as the user of (269) 769-4121, which D. HORN has been intercepted on during numerous pertinent calls to both **TARGET PHONE 1** and **TARGET PHONE 2** in which he has both discussed the location of drugs and/or requested multi-ounce quantities of methamphetamine from JAMES or STOVALL. D. HORN was identified as the user of (269) 769-4121 through subscriber information and surveillance. That telephone number is subscribed to "DeMichael Horn" residing at 755 Superior Street in Benton Harbor, Michigan. In addition,

INDIVIDUAL F leave 922 S. Park Street in a silver 2005 Chrysler 300.  That vehicle traveled to 1525 Bacon Avenue where INDIVIDUAL D was looking for the package.

43.    While en route to the apartment complex, JAMES received a call (Session #600) from RONALD GOODLOE JR., using (317) 932-2151.[8]  Below is the transcription of the call:

| | |
|---|---|
| JAMES: | What up bro? |
| GOODLOE: | What happened? |
| JAMES: | Shit, we, we just now getting out this way. |
| GOODLOE: | Fuck.  Aight. |

44.    Based on my training, experience, and familiarity with the investigation, I believe when GOODLOE asked JAMES "what happened," he meant what happened with the package of methamphetamine.  When JAMES said "we just now getting out this way," he meant that he was approaching the area where the package was supposed to have been delivered to find out what

---

on multiple days of physical surveillance, investigators have observed D. HORN either in places or with people corresponding with communications made with the user of the 4121 number.

[8]GOODLOE has been identified as the user of (317) 932-2151 as follows.  That telephone number is subscribed to "Wayne Perry" residing at 1018 Pipestone Road in Indianapolis, Indiana.  However, during electronic intercepts, the user of that telephone was referred to by STOVALL and JAMES as "Rocky" and "Rock Star."  GOODLOE has a publicly available Facebook page in the name "Rock Starr Jr.," which is believed to belong to him based on the content found on the page.  Additionally, a search of public databases for the address 1018 Pipestone Road in Indianapolis yielded no results.  However, GOODLOE's listed address on his Michigan driver's license is 1018 Pipestone Street in Benton Harbor.  Shortly after pertinent electronic intercepts on July 12, 2018, GOODLOE was observed on surveillance at 922 S. Park Street in Kalamazoo.  In addition to this conversation, GOODLOE has also had conversations with JAMES and STOVALL on both **TARGET PHONES** regarding dealing in larger quantities of methamphetamine.  Also, on July 16, 2018, STOVALL had a conversation (Session #1609) on **TARGET PHONE 2** with WHITESIDE in which WHITESIDE told STOVALL that he just purchased a pound of methamphetamine for approximately $4,500 from GOODLOE.

26

happened.  GOODLOE then voiced his displeasure.  This reveals that GOODLOE was aware of and had an interest in the package of methamphetamine.

45.     Once at the apartment complex, D. HORN and JAMES were observed searching around the mailboxes and garbage cans as if trying to locate the lost package of suspected methamphetamine.  After approximately fifteen minutes, D. HORN and JAMES left the apartment complex and returned to 922 S. Park Street in the Chrysler 300.

46.     Between approximately 4:00 p.m. and 12:00 a.m., investigators conducting surveillance on 922 S. Park Street observed approximately thirty separate vehicles arrive and leave from that address.  The vast majority of vehicles were only at the address for approximately five to ten minutes.  Based on the fact that individuals arrived at that location and stayed for a short time, along with the fact that the package of suspected methamphetamine which came to DYER had apparently been delivered it to the DTO, I believe that the people going to 922 S. Park Street were purchasing crystal methamphetamine for re-distribution.

47.     On July 7, 2018, investigators conducting electronic surveillance of **TARGET PHONE 1** intercepted multiple phone calls made by JAMES in which he told people he located the lost package and was on his way to 922 S. Park Street with it.

48.     Specifically, at approximately 11:19 a.m., JAMES spoke (Session #733) with an unknown male subject using (312) 686-4132 ("UM 4132") about the lost package, which had been recovered.  Below is an excerpt of the voice communication:

| | |
|---|---|
| UM 4132: | [Laughing] You ain't talking to em. |
| JAMES: | Hell yeah, I'm talking to em, I'm on my way to the spot, you know I got that package. |
| UM 4132: | Where was it at? The Post Office? |

27

| JAMES: | Man, no I told you what they said, the post office man, dude, he had already put the note in there, the mailman, he said he put it in the wrong box, man but he put the key in ah, so couldn't nobody get in the shit man.  He popped that bitch right open, he said here go your package right here man. |
| --- | --- |
| UM 4132: | Alright, now you got it? |
| JAMES: | Yea, you know I got it, bitch.  I finna get rock star [U/I] bitch! |
| UM 4132: | You gotta buy me one, I didn't put doubt on you, I was on your side, damn, can I get a— |
| JAMES: | [Laughing] He say, you gotta buy me one, I was on your side. [Laughing]. |
| UM 4132: | Yeah, you go against me all the time, Goddam, I don't even know, ah. |
| JAMES: | Don't say that man, I'm tired of you saying that to bitch. |
| UM 4132: | What, Ah, ah, uh, what's up. |
| JAMES: | I'm the one who always got you! |
| UM 4132: | You always get, D-Mike, all them.  What about Quis? |
| JAMES: | Man Quis, it's a field day today man, I'm finna pull up to the spot baby. |
| UM 4132: | Alright [laughing] |

49.     Based on my training, experience, and knowledge of the investigation, I believe that JAMES was able to recover the missing package of suspected methamphetamine.  JAMES told UM 4132 the postman had put the key to the postal box into the wrong box, but he was able to get it back.  At the end of the conversation, JAMES told UM 4132 that he was pulling up to the "spot," a reference to 922 S. Park Street.

50.     On July 7, 2018, while conducting electronic surveillance of **TARGET PHONE 1**, utilized by JAMES, investigators intercepted a voice call (Session #734) between

ESHAWN WHITESIDE and JAMES.  The call occurred at approximately 11:26 a.m., with WHITESIDE using telephone number (269) 823-9434.[9]  Below is the transcription of the conversation:

| | | |
|---|---|---|
| WHITESIDE: | | Hello? |
| JAMES: | | Boont, what you doing? |
| WHITESIDE: | | Not shit.  Is it good? |
| JAMES: | | This is Chees, it's money yeah. |
| WHITESIDE: | | It's there? |
| JAMES: | | It was in the box the whole time.  I told you they put the wrong key in there. |
| WHITESIDE: | | The fuck, I'm on my way over there. |
| JAMES: | | Alright, bet, I'm headed to the spot too. |
| WHITESIDE: | | Yup. |
| JAMES: | | Alright. |

51.     Based on my training, experience, and knowledge of the investigation, I believe that JAMES was telling WHITESIDE that the package of suspected methamphetamine was in the wrong postal box.  They both went on to tell each other that they were going to the "spot," or 922 S. Park Street.

---

[9] WHITESIDE has been identified as the user of (269) 823-9434 based on a Facebook search.  Law enforcement searched Facebook using that phone number, and it was associated with a Facebook page belonging to "BG Boontha."  Investigators located photographs on the Facebook page that depicted the apparent owner of the page, a person who was a visual match to the photograph associated with WHITESIDE in the Michigan Secretary of State's database.  During intercepted conversations, JAMES has referred to the person using the 9434 number as "Boont" or "Boontha."  In addition, on multiple days of physical surveillance, investigators have observed WHITESIDE either in places or with people corresponding with communications made with the user of the 9434 number.

52.    Later that day, while conducting electronic surveillance of **TARGET PHONE 1**,

utilized by JAMES, investigators intercepted a voice call (Session #754) between DYER and

JAMES.  The call occurred at approximately 1:20 p.m., with DYER using telephone number

(269) 929-0423.  Below is an excerpt of the conversation:

DYER:          Ah, yeah, did, I know who he is.  I'm saying, who talking bout, that Daisy.  He must have some change too, or some shit. [Laughing] He over there crying, that's Daisy, that's Daisy.  Barnie Rubble, what's up man? Yall still in them people's houses and shit? [To someone else in the background:] Tell [INDIVIDUAL B's first name] to come get this baggie.  You can get it.  That what she sent you for?[10]

JAMES:         Where you at?

DYER:          Uh, finna come over there and kick yawl door in.

JAMES:         We broke over here right now, we gotta get, we trying to get some money.

DYER:          Uh, ok, well I'ma give yawl a couple hours to get shit up.

JAMES:         Alright.

DYER:          Yup.  And then I'm gonna come collect, I'm comin' to collect like the rent man.

JAMES:         Alright.  I probably gonna need a ride somewhere anyways.

DYER:          Okay, I'll be over there.  Alright.

53.    Based on my training, experience, and knowledge of the investigation, I believe

that when DYER said, "Uh, finna come over there and kick yawl door in," she meant that she

---

[10] This portion of this conversation was misinterpreted in the affidavit in support of the second application for Title III interceptions.  At that time, investigators believed that DYER was asking JAMES to "come get this baggie."  Upon re-review of the recording, investigators believe that DYER was speaking with a third party, not JAMES, and was referring to her daughter, INDIVIDUAL B.

30

was going to come over and get the money for the package of suspected methamphetamine that was delivered.  JAMES went on to say that he would try to get the money together, specifically, "we trying to get some money."  DYER emphasized she needed it by saying, "I'm comin' to collect like the rent man."

54.    Also on July 7, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a phone call (Sessions #568 and #569)[11] at approximately 2:24 p.m., between STOVALL and DYER, who was using telephone number (269) 929-0423.  Below is an excerpt of the conversation:

| | |
|---|---|
| STOVALL: | Nut, Nut, Nothing man, just chillin right now what you been up to? |
| DYER: | I ain't doing nothing.  I'm, I'm trying to see did ya'll make something happen? Did you make something happen? |
| STOVALL: | [U/I].  The other one they had put the bitch in the wrong, I don't know what's his name— |
| DYER: | You say you what? |
| STOVALL: | I said yesterday they had put the other situation in the wrong what's his name, I was waiting on them, I ain't even do nothing yesterday, I had went to sleep where I was at. |
| DYER: | Mmm |

55.    Based on my training, experience, and knowledge of the investigation, I believe when STOVALL said, "I said yesterday they had put the other situation in the wrong what's his name, I was waiting on them," he was telling DYER about the package of suspected methamphetamine that had been delivered to the wrong postal box the day before.

---

[11] The wire room is configured such that some calls sent by the telephone company are divided into two or more separate session numbers.

**D.    July 9, 2018: Conversation Between STOVALL and RICHARD FARMER SR. Regarding a Shipment of MDMA**

56.    On July 9, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #843) at approximately 5:41 p.m., between STOVALL and RICHARD FARMER SR., who was using telephone number (470) 955-0097.[12]  Below is an excerpt of the conversation:

| | |
|---|---|
| FARMER: | What's going on down that way? |
| STOVALL: | Shit, man, nothing much right now trying to put stuff together and shit. |
| FARMER: | Oh, ok.  I got some M [U/I] some pills comin that way. |
| STOVALL: | Uh, uh. |
| FARMER: | [U/I] |

---

[12] FARMER has been identified as the user of (470) 955-0097 as follows.  The subscriber's address is 4300 Flat Shoals Road, Apartment 3301, Union City, Georgia.  The Accurint commercial database indicates that FARMER is associated with that address.  During intercepted communications with **TARGET PHONE 2**, STOVALL refers to the user of the phone as "Rick" and the user's voice is male.  Finally, during interaction with FBI special agents during the July 31, 2018, arrest of INDIVIDUAL G, FARMER provided (470) 955-0097 to the agents as his telephone number.

FARMER has been intercepted on multiple pertinent calls to STOVALL on **TARGET PHONE 2**.  Based on the content of the intercepted calls, FARMER, who is the father of STOVALL's sister's children, acts as a confidant and mentor to STOVALL.  For instance, on July 28, 2018, STOVALL sought and FARMER provided advice (Session #2846) regarding how to attempt to recover a package of methamphetamine that was seized by law enforcement on July 27, 2018.  In addition, FARMER provided housing for INDIVIDUAL G, wanted for a double homicide that occurred in Benton Harbor.  INDIVIDUAL G, using telephone number (954) 504-5674, was in contact with STOVALL on **TARGET PHONE 2** throughout the initial 28 days of interception.  Based on the content of the communications between STOVALL and INDIVIDUAL G, STOVALL sent INDIVIDUAL G at least $1,600 in money transfers during that 28 day period.  When the FBI located INDIVIDUAL G on July 31, 2018, in a Riverdale, Georgia, apartment, INDIVIDUAL G was with FARMER.  A subsequent search of the apartment produced a stolen handgun and approximately two pounds of MDMA.

| | |
|---|---|
| STOVALL: | Yea, Yea.  You said some, you talkin bout some um. |
| FARMER: | Talking bout the Molly. |
| STOVALL: | Oh the Molly and shit? |
| FARMER: | Pink. |
| STOVALL: | Oh yea, shit . . . |

57.    Based on my training, experience, and knowledge of the investigation, I believe when FARMER said he had "some pills comin that way," he was referring to a shipment of illegal pills that were being shipped into the Kalamazoo area.  He further clarified that he was talking about MDMA, or ecstasy, when he said "Molly," a street name for MDMA.

**E.    July 11, 2018: STOVALL and INDIVIDUAL H Discuss INDIVIDUAL H Transporting Payment for Recent Drug Packages to DUNN**

58.    On July 11, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #1078) at approximately 3:03 p.m. between STOVALL and INDIVIDUAL H, who was using telephone number (616) 606-2098.  Below is an excerpt of the conversation:

| | |
|---|---|
| STOVALL: | Yea, That's why he don't wanna take the money with him and shit, like, they checked [INDIVIDUAL H's first name] and shit woopdee woop . . . |
| INDIVIDUAL H: | So he was scared? |
| STOVALL: | Yea, Not cause of how much money I owed him and shit, but, I'm bout to take the money that I got down there cause he said he don't wanna leave nobody money cause of that shit.  I don't know man. |
| INDIVIDUAL H: | He so scary. |
| STOVALL: | I don't know. |

INDIVIDUAL H:   I mean, I mean they was but they let me go so I just feel like, you know, like, like, they let me go it wasn't nothing, it was more people, it looked like that's what they do, if you know they gotta stop you, and give you the red flag let you know, what's what, and they let me go and shit, like, and then I just told the man that, you know, [U/I] it wasn't nothing like that, like, it wasn't a lot of people looking or nothing, it was one little guard and that was it . . . what Squeeze scared for . . . gotta do what you gotta do.

STOVALL:   You already know, Squeeze had so, Squeeze had some, then you know last time when he lost little Moe and them money and that other shit he prolly think about getting stuff took.

59.   Based on my training, experience, and familiarity with this investigation, I believe INDIVIDUAL H and STOVALL were discussing her being stopped by TSA for carrying a large quantity of money to Phoenix to pay KENTRELL DUNN for methamphetamine.  "Squeeze" is DUNN's nickname according to SWET CI#3, as discussed below.  When STOVALL said, "last time when he lost little Moe and them money," he was referring to DUNN being responsible for money belonging to INDIVIDUAL I and his associates being seized by law enforcement.[13]  As a result, STOVALL believes DUNN is now very concerned about the methods used to transfer large sums of money.

60.   Below is an additional excerpt from the conversation (Session #1078) between STOVALL and INDIVIDUAL H:

STOVALL:   All I'm saying, once I think we made enough [U/I] I'ma tell him man give em something man.  Squeeze [U/I] alright, you the head of everything so you gotta, that's your job bro [U/I] fucked up.

INDIVIDUAL H:   Right.

_____

[13] On September 25, 2017, DUNN was the passenger in a vehicle that was stopped by the Oklahoma Bureau of Narcotics.  During the traffic stop, approximately $76,000 was seized from the rented vehicle.  Based on intercepted wire and electronic communications on **TARGET PHONE 2**, INDIVIDUAL I remains very angry with DUNN for losing his money and never sending him drugs as payment for the loss.

| STOVALL: | Shit, this my family and they don't even want me to fuck with you for real bro. |
|---|---|
| INDIVIDUAL H: | Right. |
| STOVALL: | That is still my family, man, I brought them niggas around, I brought them niggas to fuck wit ya man, and they spending good money wit ya.  He went on they still spending wit ya. |
| INDIVIDUAL H: | Right. |
| STOVALL: | I ain't saying like he wrong.  It's wrong on both they end cause they shouldn't of even put they money in car with him, and then he shouldn't a been smoking in the car with that money. |

61.    Based on my training, experience, and familiarity with the investigation, I believe when STOVALL said, "you the head of everything," he was referring to DUNN as the leader of the DTO due to his position as the source of supply.  When STOVALL said "he shouldn't a been smoking in the car with that money," he meant that DUNN should not have been smoking marijuana in the rental car while transporting such a large quantity of money.  The odor of marijuana can provide law enforcement legal justification to extend the scope of a traffic stop for further investigation, as it did with the Oklahoma police officers who stopped and searched DUNN.

**F.    July 13, 2018: JAMES Delivers to RONALD GOODLOE JR.**

62.    On July 13, 2018, investigators conducting electronic surveillance on **TARGET PHONE 1** intercepted a phone call (Session #1836) at approximately 5:02 p.m., between JAMES and RONALD GOODLOE JR., who was using telephone number (317) 932-2151. Below is the transcription of this conversation:

| GOODLOE: | Hello? |
|---|---|
| JAMES: | What up bitch? |

GOODLOE:   Hey give me 2 zips and a half [U/I].

JAMES:   Alright.

GOODLOE:   Alright.

63. Based on my training, experience, and familiarity with the investigation, I believe that GOODLOE was ordering two-and-a-half ounces of methamphetamine, as "zip" is street lingo for an ounce. Through subsequent calls, JAMES and GOODLOE coordinated a meeting at 922 S. Park Street. Investigators conducting surveillance observed GOODLOE driving a 2006 Land Rover pull into the back parking lot at that residence. At approximately 6:57 p.m., GOODLOE called JAMES and they had the following conversation (Session #1892):

GOODLOE:   What'd you say?

JAMES:   I'm coming up the driveway bitch.

GOODLOE:   Stanky feet hoe.

JAMES:   Alright, [U/I] bitch.

64. JAMES was observed walking up the driveway of 922 S. Park Street. At approximately 7:04 p.m., GOODLOE drove away from the residence. At approximately 7:06 p.m., JAMES walked away from the residence.

**G. July 14 and 15, 2018: JAMES Receives Product from SCOTTY CAMPBELL in Benton Harbor**

65. Throughout the day on July 14, 2018, JAMES informed multiple customers via **TARGET PHONE 1** that he did not have any methamphetamine to distribute. However, at approximately 11:48 p.m., JAMES, using **TARGET PHONE 1,** had a conversation (Session

#2140) with SCOTTY CAMPBELL, using (269) 487-8294.[14]  Below is the transcript of the

conversation:

> CAMPBELL:        Hey.
>
> JAMES:           Dude, what up?
>
> CAMPBELL:        Man, uh, bitch, uh, FaceTime me real quick.

66.     On July 15, 2018, at approximately 12:23 a.m., JAMES, using **TARGET**

**PHONE 1**, sent a text message (Session #2150) to ANDREW BAGLEY, using (269) 303-

9591,[15] which read, "Be back in a hour it's on."  At approximately 1:12 a.m., JAMES, using

**TARGET PHONE 1**, called (Session #2157) INDIVIDUAL J, using (269) 252-3123.  Below is

an excerpt of the conversation:

> JAMES:           Man, I need to get back, man, I got this shit with me.
>
> INDIVIDUAL J:    What?

---

[14] CAMPBELL has been identified as the user of (269) 487-8294 through subscriber information and corroborating physical surveillance.  The subscriber for that number provided by Sprint is "Scotty Campbell," residing at 1333 Columbus Avenue, the same address listed by CAMPBELL with the Michigan Secretary of State.  Also, on July 12, 2018, at approximately 3:55 p.m., CAMPBELL and JAMES had a conversation (Session #1530) in which CAMPBELL told JAMES he was "pulling up."  Also at 3:55 p.m., investigators conducting physical surveillance observe a white Chevrolet Impala pull into the driveway of 922 S. Park Street with CAMPBELL as the front seat passenger.

[15] In March 2018, BAGLEY coordinated the delivery of methamphetamine to a SWET UC.  BAGLEY coordinated those deliveries by talking with the UC using telephone number (269) 303-9591, but MICHAEL MARCON delivered to the UC.  The current listed subscriber for that telephone number with Verizon Wireless is INDIVIDUAL K, the mother of BAGLEY.  In addition to this methamphetamine purchase on July 18, BAGLEY has also conducted multiple other multi-ounce purchases of methamphetamine within the DTO, typically coordinating these purchases with either JAMES or STOVALL through either **TARGET PHONE 1** or **TARGET PHONE 2**.  Some, but not all, purchases have been further corroborated through surveillance by law enforcement.

| JAMES: | I need to get back to the hotel I got the shit with me. |
| INDIVIDUAL J: | I can't, hold on, I cannot hear you.  [Talking to someone else] You say what? |
| JAMES: | I need to get back, I got the shit with me. |

67.     Based on my training, experience, and knowledge of the investigation, I believe that prior to meeting with CAMPBELL, JAMES did not have any methamphetamine to sell to his customers.  I believe, based on the phone call above within the context of the communications that followed, that he and CAMPBELL then talked on FaceTime to arrange a deal in which CAMPBELL would re-supply JAMES.  Investigators were not able to intercept FaceTime communications during this investigation, and CAMPBELL and other drug traffickers may have suspected as much, and relied on FaceTime communication as a precautionary measure to keep criminal conversations from being intercepted by law enforcement.[16]  After contact with CAMPBELL, JAMES reached out to BAGLEY to let him know he was on his way back to Kalamazoo and had methamphetamine by saying, "it's on."  Then JAMES secured a ride back to Kalamazoo from INDIVIDUAL J to transport his methamphetamine, which he referred to as "shit."

---

[16] Investigators intercepted other communications in which the parties moved the conversation to FaceTime.  For instance, during a July 8, 2018, conversation (Session #942), JAMES instructed DUNN to answer a FaceTime call when DUNN began to reveal specific information about a location related to the DTO on an ordinary cellular phone call.

**H.      July 15, 2018: STOVALL Informs Others that He Will be Travelling to Arizona to Pay for Methamphetamine**

68.      One of the SWET CIs used during the investigation, SWET CI#3,[17] informed law enforcement that the source for the DTO was DUNN, a/k/a "Squeeze" or "Teddy."  SWET CI#3 stated that DUNN was from Benton Harbor and that he had visited Benton Harbor to see his girlfriend in September 2017.  SWET CI#3 then stated DTO members travel to Phoenix or California to purchase multi-pound quantities of crystal methamphetamine.

69.      This information was corroborated by interceptions during the electronic surveillance.  On July 15, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #1568) at approximately 6:03 p.m. between STOVALL and FARMER, who was using telephone number (470) 955-0097.  Below is an excerpt of the conversation:

> FARMER:        Whenever you go just let me know.
>
> STOVALL:      Shit, I'll probably take off Monday or Tuesday I don't know though, I don't know yet for sure yet cause I'm waiting for my dude to get back from Vegas and shit [U/I] I would meet him down there and shit.
>
> FARMER:        Yea, I just shown you a better way to do that shit bro, so it takes some of that pressure off of ya, I already know how that shit be bro.
>
> STOVALL:      Yeah.

---

[17] Since becoming a confidential informant, SWET CI#3 has provided information relating to the DTO including identifying the source of supply as DUNN, identifying co-conspirators, and identifying distribution and stash locations.  SWET CI#3 has been cooperating with SWET to gain relief from pending criminal charges.  SWET CI#3 has prior criminal convictions related to interactions with police, controlled substances, and driving.  While utilizing SWET CI#3, SWET has not had any issues with his or her credibility or performance to date and SWET CI#3 has been found to be reliable.

FARMER:          So, you know what I'm saying, I, like, just send that shit off, man, just make sure, you know I'm saying, that shit gets from point a to point b.

STOVALL:         Mmm Hmm.

FARMER:          I can take a lot of that pressure off of you cause, you know, we do our own thing you know?

70.     Based on my training, experience, and knowledge of the investigation, I believe when FARMER said, "Whenever you go just let me know," FARMER was saying to STOVALL that the wanted STOVALL to tell him when he was leaving for Arizona.  When STOVALL said, "I'll probably take off Monday or Tuesday," STOVALL was indicating that he was going to leave for Arizona on Monday or Tuesday.  When FARMER then said, "I'll show you a better way to do that shit bro, so it takes some of that pressure off of y'all," he was suggesting to STOVALL that he could tell him how to send the drug proceeds to DUNN without having to fly out to Arizona.

71.     On July 16, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #1609) at approximately 12:01 p.m. between STOVALL and ESHAWN WHITESIDE, who was using telephone number (269) 823-9434.  Below is an excerpt of the conversation:

WHITESIDE:       Damn, that's how you do it, baby?

STOVALL:         Man [laughing] [U/I] today and shit.

WHITESIDE:       Man, that's . . .

STOVALL:         I'm probably gonna take off tomorrow though bro, I'ma turn in my ID right now and shit . . .

WHITESIDE:       Man.  That's why you do your thing man.

72.     Based on my training, experience, and knowledge of the investigation, I believe when STOVALL said, "I'm probably gonna take off tomorrow though bro, I'ma turn in my ID right now and shit . . ." that he was talking about traveling to Arizona to meet with DUNN and that he needed his identification to travel by air.  As discussed below, STOVALL and WHITESIDE did, in fact, travel to Arizona in July 2018.

**I.     July 18, 2018: STOVALL Receives Methamphetamine from SCOTTY CAMPBELL in Benton Harbor**

73.     On July 18, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a phone call (Session #1851) at approximately 7:50 p.m. between STOVALL and CAMPBELL, using (269) 487-8294.  Below is an excerpt of the conversation:

| | |
|---|---|
| CAMPBELL: | Hello? |
| STOVALL: | [U/I], so you still on or what? |
| CAMPBELL: | Yeah, naw I'm still down here, yeah, Meechie bullshittin'. |
| STOVALL: | I still want [U/I], and little cousin want half and shit. |
| CAMPBELL: | Want half with [U/I], you can't come this way? |
| STOVALL: | Yeah, I'm fittin to come right now bro. |
| CAMPBELL: | Alright, so how many you wanted? |
| STOVALL: | Shit, [U/I] seven, my cousin got two for a half, [U/I]  then shit, I might need a rack but if you want to put that other half on it, I'll have it tomorrow before you go out. |
| CAMPBELL: | Alright. |

74.     Based on my training, experience, and familiarity with the investigation, I believe when CAMPBELL asked STOVALL "so how many you wanted," CAMPBELL was asking STOVALL how much methamphetamine he wanted to purchase.  STOVALL replied "I might need a rack, but if you want to put that other half on it, I'll have it tomorrow before you go out." A "rack" means $1,000.  STOVALL meant he needed at least $1,000 worth of methamphetamine, but if CAMPBELL could give him more than that, he could repay CAMPBELL the next day.  This characterization is corroborated by the following narrative, which documents how STOVALL met with CAMPBELL and then supplied methamphetamine to three customers who typically purchase an ounce or more at a time.

75.     Investigators observed STOVALL leave **Subject Premises 1** on foot at approximately 7:49 p.m. on July 18.  In addition, investigators also observed, via real-time cell tower and sector information monitored pursuant to a warrant, at approximately 8:00 p.m., **TARGET PHONE 2** started to travel from the area of **Subject Premises 1** and proceeded to Benton Harbor.

76.     STOVALL and CAMPBELL had further short communications coordinating a location to meet.  At approximately 9:45 p.m., **TARGET PHONE 2** started to travel from Benton Harbor and proceeded back to Kalamazoo.  After initially contacting CAMPBELL to purchase the methamphetamine, STOVALL also contacted DAVID UMINN, ROBERT ARMSTRONG, and ANDREW BAGLEY to coordinate the delivery of methamphetamine to them.  STOVALL arranged to meet UMINN and BAGLEY at the parking lot of the Crow's Nest restaurant in Kalamazoo.  STOVALL arranged to meet with ROBERT ARMSTRONG at his residence, **Subject Premises 3**.

77.     At approximately 10:29 p.m., STOVALL had the following conversation (Session #1894) with UMINN, using (269) 348-6239:[18]

| | |
|---|---|
| STOVALL: | How much you got? |
| UMINN: | I'll be there in about five minutes, what's up? |
| STOVALL: | How much you got? |
| UMINN: | Enough for a zip. |
| STOVALL: | Alright. |
| UMINN: | Alright. |

78.     At approximately 10:33 p.m., investigators conducting physical surveillance at the Crow's Nest observed a Volkswagen Jetta pull into the parking lot.  The Crow's Nest was where STOVALL and UMINN had agreed to meet and also where the DTO has conducted the majority of their methamphetamine transactions after STOVALL moved from 922 S. Park Street to **Subject Premises 1** around July 13, 2018.  Investigators conducting surveillance identified the front passenger in the Jetta as DAVID UMINN.

79.     At 10:55 p.m., investigators conducting physical surveillance observed MICHAEL HORN[19] walk up to and meet with the occupants of the Jetta.  After a brief meeting,

---

[18] "David Uminn" is the current listed subscriber for (269) 348-6239 with T-Mobile.  In addition to this methamphetamine purchase on July 18, UMINN has also conducted multiple other multiple other ounce-quantity purchases of methamphetamine within the DTO, typically coordinating these purchases with either JAMES or STOVALL through either **TARGET PHONE 1** or **TARGET PHONE 2**.  Some, but not all, purchases have been further corroborated through surveillance by law enforcement.

[19] In addition to these methamphetamine deliveries on July 18, M. HORN has been observed on surveillance delivering multi-ounce quantities of methamphetamine on other days to customers on behalf of JAMES and STOVALL.  M. HORN also has been intercepted in

M. HORN walked away and the Jetta left the parking lot and was surveilled to **Subject Premises 2**, UMINN's residence.

80.     At 11:01 p.m., ANDREW BAGLEY, using (269) 303-9591, texted STOVALL, "I'm here."  At that same time, investigators conducting physical surveillance at the Crow's Nest observed the 2010 Chevrolet Equinox, bearing Michigan license plate CNV7631, pull into the parking lot of the Crow's Nest.  (BAGLEY had been observed driving this vehicle during prior surveillance.)  At 11:08 p.m., investigators observed M. HORN walk up to the passenger side of the Equinox.  After a brief exchange, M. HORN left on foot and the Equinox left the parking lot. At 11:15 p.m., M. HORN was observed walking back to and entering **Subject Premises 1**. Based on the intercepted communication and the short duration of M. HORN's visit to the car, I believe M. HORN delivered methamphetamine to BAGLEY at this time.

---

numerous pertinent, incriminating conversations while using (269) 532-8203.  For instance, on August 15, 2018, JAMES coordinated (Session #6764) a three-ounce deal of methamphetamine with Individual V using **TARGET PHONE 1**.  He subsequently called (Session #6772) M. HORN and provided instructions regarding the delivery of the three ounces to INDIVIDUAL V. Specifically, JAMES told M. HORN, "if she don't got eleven hundred, don't give her all of it, bro, make sure she got eleven hundred."  $1,100 was the price JAMES and INDIVIDUAL V agreed on for the three ounces.  M. HORN replied, "alright," and was subsequently observed by investigators delivering the three ounces of methamphetamine to INDIVIDUAL V at the Crow's Nest.

M. HORN has been identified as the user of (269) 532-8203 as follows.  When communicating with or about the user of the 8203 number, JAMES, using **TARGET PHONE 1**, refers to the user as "Benji."  Investigators located the publicly available Facebook page of MICHAEL HORN, which is under the Facebook user name of "Mikee Benjji."  It is apparent that the page belongs to him based on the publicly available content.  Both JAMES and STOVALL, using both **TARGET PHONES**, have directed the user of the 8203 number to deliver methamphetamine to customers.  Investigators on surveillance have then observed M. HORN delivering methamphetamine to those customers consistent with the intercepted conversations.

44

81.　　On July 19, 2018, at approximately 12:19 a.m., investigators conducting surveillance of **Subject Premises 3**, the residence of ROBERT ARMSTRONG, observed a light colored SUV arrive and park on the side of the road in front of that residence.  At the same time, STOVALL had the following conversation (Session #1907) with ARMSTRONG, using (269) 220-2751:[20]

ARMSTRONG:　　Yeah?

STOVALL:　　[U/I] come to the door.

ARMSTRONG:　　Hey ah, I'm at Speedway, I'm headin' back right now, one minute.

STOVALL:　　Alright, [U/I]

ARMSTRONG:　　Alright

---

[20] ARMSTRONG has been identified as the user of (269) 220-2751 based on intercepted communications and physical surveillance.  During an intercepted phone call, the user of the 2751 number arranged a meeting with STOVALL at **Subject Premises 3**.  A law enforcement database indicates ARMSTRONG is a current resident at that address.  During a different interception, STOVALL and the user of the 2751 number arranged a meeting.  Law enforcement surveilled that address and saw an individual meet with STOVALL there shortly after that intercepted communication.  Investigators obtained a photograph of ARMSTRONG from the Michigan Secretary of State and they were able to positively identify the person that was meeting with STOVALL as ARMSTRONG.  On July 19, 2018, ARMSTRONG began communicating with STOVALL from telephone number (269) 220-2267.  Investigators recognized the user of the 2267 number as ARMSTRONG because it was the same voice as the user of the 2751 number.

In addition to this methamphetamine purchase, ARMSTRONG has also coordinated multiple other meetings with STOVALL intercepted on **TARGET PHONE 2**.  While ARMSTRONG and STOVALL have largely avoided discussing weights or prices over **TARGET PHONE 2**, on July 23, 2018, STOVALL asked (Session #2359) ARMSTRONG, "You can't buy two Z's right now can you?"  ARMSTRONG replied, "Uh, no, but, probably buy 1."  Based on my training, experience, and knowledge of the investigation, I believe STOVALL asked ARMSTRONG if he could buy two ounces of methamphetamine.  ARMSTRONG replied that he could only buy one.  However, it appears that STOVALL did not sell methamphetamine to ARMSTRONG on July 23 because of the absence of communications between the two of them to arrange the location and time for a deal.

STOVALL:               [Talking to a person in the background] He told me he at
                       Speedway, but he comin' right fast.

82.     At 12:22 a.m., a vehicle pulled into the driveway of **Subject Premises 3**.  An

individual matching the physical description of ARMSTRONG exited the vehicle in the

driveway and an individual matching the physical description of STOVALL exited the SUV

parked on the side of the road.  Both individuals then entered into the front door of **Subject**

**Premises 3**.

> **J.      July 22 through 25, 2018: STOVALL and WHITESIDE Travel to Phoenix to**
> **Purchase Methamphetamine from DUNN**

83.     On July 22, 2018, investigators conducting electronic surveillance on **TARGET**

**PHONE 2** intercepted an outgoing text message (Session #2241) from STOVALL to BAGLEY,

using (269) 303-9591.  The text message, sent at approximately 2:32 a.m., read: "Bro do you got

like 15 I can hold to the am I'm short to get stuff I'm look out for u."  At approximately 10:45

a.m., BAGLEY responded (Session #2264), "Yo my bad bro phone was bangin so shut it off."

At approximately 10:55 a.m., STOVALL texted (Session #2265), "I need like 15 I'm have today

a couple dollars short what I'm trying to get anything gone help I got you bro bro."  At

approximately 11:56 a.m., BAGLEY responded (Session #2265), "I'm omw to Michigan

adventures rn but I can hit Mike up real quick."  At approximately 1:29 p.m., BAGLEY texted

(Session #2287), "Mikey said how fast after he gives you that will u have the work cause he said

if he gives you that for me he wont be able to grab the 3 zips he needs."  At approximately 10:01

p.m., STOVALL texted (Session #2350), "I don't got nothing but 2 z I'll make sure they chunk."

84.     Based on my training, experience, and familiarity with the investigation, I believe

STOVALL was raising funds to purchase as much methamphetamine as possible during his

upcoming trip to Phoenix.  When he said "I need like 15 I'm have today a couple dollars short

what I'm trying to get," he meant he wanted to have an additional $1,500 to add to his money so that he could buy more methamphetamine. BAGLEY said he was not able to provide the money, but contacted "Mikey" to see if he could provide STOVALL the money. Investigators believe "Mikey" is MICHAEL MARCON.[21]

85. On July 22, 2018, five minutes after BAGLEY informed STOVALL he would hit "Mikey" up real quick, toll records for BAGLEY's phone show that he placed an approximate five-minute call to MARCON, using (269) 359-2121. According to his toll records, BAGLEY continued to communicate with both MARCON and STOVALL over the next three hours.

86. Based on subsequent surveillance, investigators do not believe that STOVALL met with BAGLEY or MARCON on July 22, 2018. However, on July 23, 2018, BAGLEY met with STOVALL to purchase STOVALL's last two ounces of methamphetamine (as discussed in Paragraph 83 above, STOVALL texted BAGLEY that he had "nothing but 2 z," or zips) and

---

[21] MARCON and BAGLEY work together. MARCON made three controlled deliveries of methamphetamine, for a total weight of approximately 70 grams, to a UC on February 27, March 7, and March 29, 2018. The first two controlled deliveries were initially coordinated through BAGLEY, using (269) 303-9591. Those two deliveries were then conducted by MARCON. The last and largest controlled delivery was coordinated and delivered by MARCON, using (269) 359-2121. In addition, on July 9, 2018, BAGLEY coordinated a four-ounce purchase of methamphetamine from JAMES, using **TARGET PHONE 1**. Approximately thirty minutes after that conversation, investigators conducting surveillance then observed BAGLEY, in his Equinox, travel in tandem with MARCON, in a blue Saturn Aura, away from the purchase location of 922 S. Park Street to Stadium Drive Apartments, located on Lakesedge Drive. The Aura, bearing Michigan license plate DQR1223, that MARCON was driving is registered to INDIVIDUAL L, residing at 4259 Lakesedge Drive, Apartment A (**Subject Premises 8**). INDIVIDUAL L is MARCON's girlfriend, and the lessee at **Subject Premises 8** according to Stadium Drive Apartments records. On August 14, 2018, investigators observed MARCON coming and going from the entrance to Apartment A at 4259 Lakesedge Drive. In addition, on August 9, 2018, investigators observed BAGLEY purchase four ounces of methamphetamine from JAMES at the Crow's Nest after coordinating the deal on **TARGET PHONE 1**. BAGLEY then drove directly from the Crow's Nest to the area of 4259 Lakesedge Drive.

supply him with additional funds to purchase more methamphetamine in Phoenix.  Investigators conducting surveillance observed STOVALL meet with BAGLEY in the back parking lot of the Crow's Nest at approximately 10:33 a.m. after the deal was set up during a call on **TARGET PHONE 2**.

87.    On July 23, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #2392) between STOVALL and INDIVIDUAL A, using telephone number (269) 762-9554.  At approximately 1:26 p.m., STOVALL called INDIVIDUAL A and informed her he was on his way to her residence.  Investigators observed STOVALL and ESHAWN WHITESIDE leave **Subject Premises 1** on foot at approximately 1:02 p.m., each with a large duffle bag.  In addition, at approximately 1:26 p.m., **TARGET PHONE 2** was located in the area of the building containing **Subject Premises 5**, the apartment in which INDIVIDUAL A lives.  In subsequent conversations between INDIVIDUAL A and STOVALL on July 23, 2018, they discussed INDIVIDUAL A purchasing plane tickets for STOVALL.  Also, at approximately 2:30 p.m., **TARGET PHONE 2** was located in Benton Harbor after traveling from Kalamazoo, according to cell phone location information obtained pursuant to a warrant.

88.    At approximately 2:54 p.m., **TARGET PHONE 2** began moving away from Benton Harbor and continued to travel to Chicago, Illinois.  At approximately 11:56 p.m. ET, DEA agents in Phoenix observed and photographed STOVALL and WHITESIDE as they exited Southwest Airlines Flight #149 in the Phoenix International Airport.

89.    On July 24, 2018, at approximately 12:09 a.m., investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #2478) between

48

STOVALL and DUNN, using telephone number (623) 216-7035.  The following is the transcript from that call:

| | |
|---|---|
| STOVALL: | Squeeze? |
| DUNN: | What door y'all at? |
| STOVALL: | We at door 8, terminal 4. |
| DUNN: | Im at Terminal 4, and I'm at door, and I'm at, uh— |
| STOVALL: | We at Terminal 4 south. |
| DUNN: | Terminal 4 South? Ok, I'm on the North side, I'ma come around right now. |
| STOVALL: | Alright. |
| DUNN: | Alright. |

90.    Based on my training, experience, and familiarity with the investigation, I believe STOVALL was coordinating with DUNN for him to pick up STOVALL and WHITESIDE from the airport after they landed.

91.    Records from American Airlines indicate that STOVALL was on a July 25, 2018, flight that departed at 3:25 p.m. MT, from Phoenix to Chicago, and that he was accompanied by ESHAWN WHITESIDE.  Those tickets were purchased using an @yahoo.com e-mail address containing INDIVIDUAL A's name.

**K.    July 26 and 27, 2018: DTO Receives One Package of Methamphetamine and Law Enforcement Seizes a 4 Pound, 13.8 Ounce Package of Methamphetamine**

92.    On July 26, 2018, USPIS identified two packages shipped via USPS from the greater Phoenix area to Kalamazoo on July 25, 2018.  The first package was shipped to INDIVIDUAL M at 719 Butterfly, Apartment 357, Kalamazoo, Michigan, which is the name

and address of ESHAWN WHITESIDE's mother.  The other package was sent to INDIVIDUAL N at 760 S. Drake Road, Apartment 112 in Kalamazoo.  That person and address had not been previously identified during the investigation as a delivery point for crystal methamphetamine packages.

93.    On July 27, 2018, USPIS obtained the package, from the post office, which had been shipped to 719 Butterfly, Apartment 357, and obtained a search warrant for the package.  It was found to contain approximately 4 pounds, 13.8 ounces of suspected crystal methamphetamine.

94.    Also on July 27, 2018, at approximately 8:25 a.m., investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #2663) between STOVALL and INDIVIDUAL O, using (269) 944-6026.  Below is the transcription of that call:

STOVALL:         Supposed to, Uh, on that situation and shit.

INDIVIDUAL O:   Oh, what, ole girl?

STOVALL:         Uhhhhh [U/I] right now.

INDIVIDUAL O:   What do you want me to do then?

STOVALL:         Huh?

INDIVIDUAL O:   Today?

STOVALL:         Yea.

INDIVIDUAL O:   In the, in the mail?

STOVALL:         Yea.

INDIVIDUAL O:   Ah, alright, well I'm finna drop her off and sit at the box.

STOVALL:         Shit, shit, Alright.  Uh, I'm bout to come west in a minute though.

INDIVIDUAL O:   You what?

STOVALL:              Uh, I finna hit you up in like 20 minutes.

INDIVIDUAL O:     Alright.  Hey we got be on that tra—, hey we got to be on that tracking number today cuz, so make sure you got that number.

STOVALL:              I'm finna send em to you.

INDIVIDUAL O:     Alright.

95.     Based on my training, experience, and familiarity with the investigation, I believe STOVALL and INDIVIDUAL O had a conversation regarding one of the packages that was scheduled to arrive on July 27, 2018.  When INDIVIDUAL O asked, "in the mail?" she was clarifying with STOVALL that the "situation" he mentioned was a reference to the package coming in the mail.  STOVALL confirmed and then INDIVIDUAL O said she was going to "sit at the box," that is, wait for the package at the appropriate mailbox.  INDIVIDUAL O also instructed STOVALL to be diligent in tracking the location of the package when she said, "we got to be on that tracking number today cuz, so make sure you got that number."

96.     At approximately 10:20 a.m., investigators began conducting physical surveillance in the area of 760 S. Drake Road.  At approximately 10:40 a.m., INDIVIDUAL O was observed driving into the area in a silver Hyundai Santa Fe she had been observed driving through previous surveillance.  At approximately 11:23 a.m., INDIVIDUAL O was observed receiving a large white postal package from the mailboxes associated with 760 S. Drake Road.  At approximately 11:25 a.m., INDIVIDUAL O called STOVALL.  The following is the transcription of that conversation (Session #2679):

STOVALL:              Hello? Cuz, what up?

INDIVIDUAL O:     Where you at?

| STOVALL: | Ca, ca, ca, I'm in back of stadium. |
| INDIVIDUAL O: | You back there? |
| STOVALL: | Naw . . . I fittin to be. |
| INDIVIDUAL O: | I sure got it. |
| STOVALL: | Alright, come to the back of stadium. |
| INDIVIDUAL O: | Like, right now, or you need a few minutes to get there? |
| STOVALL: | Shit Shit come like uhh . . . leave in ten mintues. |
| INDIVIDUAL O: | Okay. |
| STOVALL: | Alright. |

97.    Based on my training, experience, and familiarity with the investigation, I believe INDIVIDUAL O was notifying STOVALL that she had the package when she said, "I sure got it." STOVALL instructed INDIVIDUAL O to "come to the back of stadium," which meant the area of Stadium Drive Apartments, where INDIVIDUAL A resides, at **Subject Premises 5**.

98.    At approximately 11:50 a.m., investigators observed STOVALL and INDIVIDUAL O meet in the parking lot near 4001 Lakesedge Drive, which is part of the apartment complex. STOVALL was the passenger in a black 2018 Kia Sorento SUV bearing Kentucky license plate number 162 XCT, registered to EAN Holdings LLC (a holding company for Enterprise) and rented by DAISY DYER. Investigators were only able to see that the driver was a heavy-set black female, which matches the physical description of DYER. Investigators observed both STOVALL and INDIVIDUAL O handle the postal package in the front of the Santa Fe. Then both STOVALL and INDIVIDUAL O exited the Santa Fe and went into the trunk of the Santa Fe. INDIVIDUAL O obtained her purse, they closed the trunk, and then both STOVALL and INDIVIDUAL O walked away from the Santa Fe and toward **Subject**

52

**Premises 5**.  Approximately two minutes later, STOVALL and INDIVIDUAL O walked away from **Subject Premises 5** and STOVALL left in the Sorento and INDIVIDUAL O left in the Santa Fe.

99.    STOVALL was surveilled back to **Subject Premises 1**.  At 12:37 p.m., STOVALL left in the Kia Sorento from **Subject Premises 1** and was surveilled as he traveled to Benton Harbor.  Once in Benton Harbor, STOVALL picked up JAMES from the area of **Subject Premises 4**.  The Sorento then traveled to 1271 Pavone Street in Benton Harbor, the residence of INDIVIDUAL I and INDIVIDUAL P.  After leaving Pavone Street, investigators lost the Sorento in the area of downtown Benton Harbor.

100.    Investigators conducting surveillance in the area of 719 Butterfly Road, the location to which the seized package was to be delivered, observed INDIVIDUAL M and ESHAWN WHITESIDE in the area at the same time the mail was being delivered.

101.    At approximately 3:05 p.m., STOVALL, using **TARGET PHONE 2**, had a conversation (Session #2733) with INDIVIDUAL M, using (269) 377-8157.  Below is an excerpt from that call:

| | |
|---|---|
| INDIVIDUAL M: | Hello? |
| STOVALL: | Momma Duke. |
| INDIVIDUAL M: | Huh? |
| STOVALL: | You, You, You go have to go to the post office and get it cause, He, Y'all didn't write, Y'all didn't write the right address.  You go to walk in there before 5 o'clock. |
| INDIVIDUAL M: | Go in what, in what post office? |
| STOVALL: | Your, your post office.  Y'all didn't write the right address on there, on the one I told you.  Y'all have an apartment number on y'all, um, thing? |

INDIVIDUAL M:     Ok go to my post office.

STOVALL:          A- and just grab it from them.  Just show them your ID, he put your name on there I'm saying.  If he put your name, just show them your ID and they'll give it to you 'cause it don't got that, probably don't got that, uh.  They probably ain't got the apartment number that's why I told him make sure he write everything down there, man.

INDIVIDUAL M:     I told them 719 Butterfly apartment 357 they must a—

STOVALL:          He probably, he probably, he probably ain't put it on there right, though.  Cause he put, y'all say send, then [U/I] you know, send it, he just changed his ass up.

102.    Based on my training, experience, and familiarity with the investigation, STOVALL and INDIVIDUAL M were discussing the package USPIS seized and found to contain over four pounds and trying to explain why INDIVIDUAL M and ESHAWN WHITESDE did not receive the package.  STOVALL blamed WHITESIDE for not providing his complete address to the mailer of the package.  STOVALL also instructed INDIVIDUAL M to go to the post office to receive the package.  USPIS confirmed that on July 27 and July 28, INDIVIDUAL M contacted the post office to inquire about the package.

**L.     July 28, 2018: Conversation between STOVALL and DUNN regarding the Seized Package**

103.    On July 28, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a phone call (Session #2840) at approximately 1:48 p.m. between STOVALL and DUNN, using (623) 216-7035, regarding the package of methamphetamine seized by law enforcement.  Below is an excerpt of the conversation:

DUNN:             Man I already, yea I already know, man, that shit, he gotta be more, he got, he should know that, man, He gotta, man, he gotta [U/I].  I don't, I don't, I didn't call [U/I].  I didn't even look at that.

|  | |
|---|---|
|  | I always call you for that like shit.  Is this bitch spelled right? Even if you did spell em right like did you spell this bitch right and its good? |
| STOVALL: | Yeah. |
| DUNN: | And it's right? I always make sure, you know what I'm saying, so I knew and he knew cause man you done been through that shit a lot so I'm like [U/I]. |
| STOVALL: | Naw, Naw.  He knew it.  He, he knew it, it just uuhhhh.  I guess, I guess they put, I guess, you know, he had wrote it wrong.  You there? |
| DUNN: | I hear you. |
| STOVALL: | Yeah.  Well, shit, I finna try have her do that right now, see. |
| DUNN: | Yeah.  Hurry up.  Hurry up.  Cause actually you know you got 2 hour 3 hour difference too.  [U/I] at two o'clock too today, two o'clock. |

104.    Based on my training, experience, and familiarity with the investigation, I believe the "he" STOVALL and DUNN are referring to is ESHAWN WHITESIDE.  Based on other pertinent conversations around this timeframe, WHITESIDE was blamed for incorrectly conveying his mother's address to DUNN, which they believed resulted in the package being returned to sender.  When DUNN said, "I always call you for that," he meant that in the past, when he and STOVALL had conducted similar transactions, DUNN has typically called and confirmed the address that STOVALL provided.  DUNN further confirmed that he and STOVALL have done this multiple times before when he said, "cause man you done been through that shit a lot," meaning STOVALL has been through this process of shipping methamphetamine with DUNN many times before.

**M.      July 28, 2018: STOVALL and D. HORN Conspire to Distribute Four Ounces of Methamphetamine to RONNIE SMITH**

105.      On July 28, 2018, at approximately 2:38 p.m., investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #2855) between STOVALL and RONNIE SMITH, using (269) 359-2885.[22]  Below is the transcription of the call:

| | |
|---|---|
| SMITH: | Yo? |
| STOVALL: | What up? |
| SMITH: | Hey, I can't just slide on you and just buy four for eleven real quick? [U/I] |
| STOVALL: | Yea, you can do that. |
| SMITH: | Shit where you at? |
| STOVALL: | Come to Crow's Nest. |
| SMITH: | Alright I'm right here leaving from the mall. |

[22] SMITH was identified as the user of (269) 359-2885 as follows.  The listed subscriber for that telephone number is INDIVIDUAL Q, who is the mother of RONNIE SMITH.  The user of the 2885 number is a male.  Also, in a JPAY conversation with incarcerated inmate INDIVIDUAL R, the user of a JPAY account belonging to INDIVIDUAL Q sent this message: "what's up my boy Hit me up 269-359-2885."  When INDIVIDUAL R asked who was messaging him, the user replied it was "Nun Nun."  SMITH has an active, publicly available Facebook page under the user name of "JuugGang Nunde," which includes pictures of SMITH with JAMES and STOVALL.  During the July 30, 2018, conversation (Session #4637) with JAMES on **TARGET PHONE 1**, JAMES called the user of the 2885 number "Nun."  SMITH was previously identified on intercepted calls using telephone number (269) 993-9838.  The user of the 2885 number has the same voice as the user of the 9838 number.

In addition, KVET has a confidential informant, hereinafter referred to as KVET CI#1, who reported in April 2018 that RONNIE SMITH JR. was dealing methamphetamine and was using (269) 993-9838 to do so.  KVET CI#1 has not yet worked in an operational capacity for KVET, but the information he or she provided regarding RONNIE SMITH JR., such as his address, phone number, and involvement in methamphetamine distribution, has been corroborated.  In addition, KVET has not had any cause to doubt his or her reliability or credibility.

STOVALL: Yeah.

SMITH: Alright.

106. Based on my training, experience, and knowledge of the investigation, I believe SMITH and STOVALL were coordinating a deal for four ounces of methamphetamine. When SMITH said, "I can't just slide on you and just buy four for eleven real quick?" SMITH was asking if he could buy four ounces of methamphetamine for $1,100. STOVALL agreed and directed SMITH to come to the Crow's Nest.

107. At approximately 2:51 p.m., investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #2856) between D. HORN, using **TARGET PHONE 2**, and SMITH, using (269) 359-2885. Below is an excerpt of the conversation:

SMITH: Yo?

D. HORN: Hey, I'm on my way walking up there bro. This is D-Mike.

SMITH: This is D-Mike's fat ass?

D. HORN: Yeah, I'm fittin to umm, what . . . what . . . what car you in?

SMITH: I'm in my Buick bro.

D. HORN: Ah, you by yourself?

SMITH: No I'm with my girl and my lil homie.

D. HORN: I was fittin to say I was gonna hop in with you.

SMITH: You can hop in bro.

D. HORN: Alright, I'm walking up there right now.

SMITH: Alright, I'm right here about to pull up.

108.    Based on my training, experience, and knowledge of the investigation, I believe STOVALL gave **TARGET PHONE 2** to D. HORN to coordinate and deliver the four ounces of methamphetamine to SMITH.  During the call, D. HORN self-identified when he told SMITH, "This is D-Mike."  SMITH then told D. HORN he was in his "Buick," and they agreed to meet in the Crow's Nest parking lot.  At the same time as the above conversation, investigators observed D. HORN leave **Subject Premises 1** while talking on a cell phone.  A short time later, investigators observed D. HORN walking into the parking lot of the Crow's Nest.  D. HORN walked into an area of the parking lot which was out of the investigators line of sight.  However, a few minutes after D. HORN walked out of sight, a black Buick drove out of the parking lot.[23] Approximately five minutes after the Buick left the parking lot, D. HORN was observed walking back into **Subject Premises 1**.

### N.    July 30, 2018: STOVALL and JAMES Conspire to Distribute One Pound of Methamphetamine to RONNIE SMITH

109.    On July 30, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a phone call (Session #3155) at approximately 6:05 p.m. between STOVALL and RONNIE SMITH, using (269) 359-2885.  Below is an excerpt of the conversation:

> SMITH:            Yo?
>
> STOVALL:         What, what up cuz?

---

[23] A police report from July 8, 2018, indicates that SMITH was stopped while driving a black 2011 Buick Lacrosse, bearing Michigan license plate DWT5746, and marijuana was located inside the vehicle.  That Buick is registered to INDIVIDUAL S residing at 305 Phelps Avenue in Kalamazoo, the residence SMITH provided as his address to the state probation office.

| | |
|---|---|
| SMITH: | Whats up bro bro? |
| STOVALL: | Huh? |
| SMITH: | Shit, waitin on you. |
| STOVALL: | What you tryin, what you tryin to get on? |
| SMITH: | What you tax me for a whole one? |
| STOVALL: | Said a whole one? |
| SMITH: | Yeah. |
| STOVALL: | Here I come, where you at? |
| SMITH: | I'm at [U/I]. |
| STOVALL: | East? |
| SMITH: | Yeah. |
| STOVALL: | Come to uhh, come, come to crow's nest, Im fittin to walk up there right now bro. |
| SMITH: | What you gonna tax me for it? |
| STOVAL: | Four five bro. |
| SMITH: | Come on man [U/I].  Come on bro.  Can I get it for forty two? |
| STOVALL: | Alright, come on. |

110.    Based on my training, experience, and knowledge of the investigation, STOVALL and SMITH are discussing the price of a pound of methamphetamine.  SMITH asked STOVALL for the price of a pound of methamphetamine when he said, "What you tax me for a whole one?"  STOVALL initially told SMITH the price is $4,500.  However, SMITH asked for $4,200 and STOVALL agreed.

59

111.    This deal was further discussed and finalized between SMITH and JAMES on

**TARGET PHONE 1**.  At 6:41 p.m., SMITH and JAMES had a conversation (Session #4645)

regarding where each other was located and what vehicle JAMES was in.  At 6:58 p.m., SMITH

and JAMES had an additional conversation (Session #4651) after the transaction had been

completed.  The following is an excerpt of the conversation:

| | |
|---|---|
| JAMES: | Hello? |
| SMITH: | Yo? |
| JAMES: | What up? |
| SMITH: | Hey, man, how can every last one of them zips short, bro? |
| JAMES: | Short, what? |
| SMITH: | They short, nah, they only short like, one of 'em was short a gram, that was the most one of them was short.  But, every last one of them weigh [U/I] eight five with the bag, bro.  I feel like— |
| JAMES: | I'm gonna get it to ya, man, cause somebody, where we been putting our shit at, mother fucker been dippin and shit anyway. |
| SMITH: | Some of them only 27 grams and shit like that bro, I'm like, damn, I know that's weird bro. |

112.    Based on my training, experience, and knowledge of the investigation, SMITH

was informing JAMES that all of the ounces of methamphetamine comprising his purchase were

slightly less than 28 grams.  SMITH told JAMES that with the bag, the ounces weighed 28.5

grams.  Typically, the bag containing the methamphetamine weighs at least a gram, making these

ounces slightly short.

### O.    August 5, 2018: STOVALL and INDIVIDUAL I Discuss the Price of Methamphetamine

113.    On August 5, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #3478) at approximately 6:46 p.m. between STOVALL and INDIVIDUAL I, using (269) 876-9273.  The following is an excerpt of the conversation:

INDIVIDUAL I:    Damn playa.

STOVALL:    I say what, I say what's, I say what's the tix?

INDIVIDUAL I:    Shit 3,000 [U/I].

STOVALL:    Alright.  I finna, I finna see if I could do that for you and shit.  I prolly, I prolly got 5 for you.

INDIVIDUAL I:    [U/I].

114.    Based on my training, experience, and familiarity with the investigation, I believe that STOVALL and INDIVIDUAL I were discussing a potential future large quantity deal of methamphetamine.  When STOVALL asked "what's the tix?" he was asking for the price. INDIVIDUAL I replied with a price of $3,000.  When STOVALL said, "I prolly got 5 for you," he indicated he wanted five pounds of methamphetamine for a total price of $15,000.

### P.    August 7, 2018: STOVALL Instructs INDIVIDUAL A to Change STOVALL's Phone Number

115.    On August 7, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a phone call (Session #3734) at approximately 9:27 p.m. between STOVALL and INDIVIDUAL A, using (269) 762-9554.  Below is an excerpt of the conversation:

INDIVIDUAL A:    Mmm, mmm don't think so.

STOVALL:    Call and see man.

61

INDIVIDUAL A:     To what area code?

STOVALL:          It could be, it could be the same area code.

INDIVIDUAL A:     You trying to change your number—

STOVALL:          Yea

INDIVIDUAL A:     And for what, so the same people can have it.

STOVALL:          Nah, I ain't gonna give nobody my number, man.

INDIVIDUAL A:     Alright.

116.     Based on my training, experience, and familiarity with the investigation, I believe

STOVALL requested INDIVIDUAL A, who is the subscriber of his cellular telephone, to

change his telephone number.  On August 8, 2018, Verizon Wireless confirmed that **TARGET**

**PHONE 2**'s number was changed to (213) 760-0160.  Pursuant to the Court's authorization,

investigators continued to intercept the phone despite the number change.

### Q.     August 8, 2018: STOVALL Sends Six Pounds of Methamphetamine from Benton Harbor to JAMES in Kalamazoo

117.      On August 8, 2018, at approximately 2:56 p.m., investigators conducting

electronic surveillance intercepted a call (Session #5635) from **TARGET PHONE 1** to

**TARGET PHONE 2**.  Below is an excerpt of the conversation:

JAMES:            Hello?

STOVALL:          Blow Pack.

JAMES:            What up, bro? What up, bro?

STOVALL:          Where the fuck you at?

JAMES:            The Zoo.

STOVALL:          Who all over there?

JAMES:              Just me and Mike Benji

STOVALL:            Alright, I'm finna se— Ain't nobody been callin'?

JAMES:              Shit, couple motherfuckers.

STOVALL:            Shi, Shi, Shi, I'm finna send these six bows over there and run through them bitches, Blow Pack.

JAMES:              Alright, it's a bet.  You already know.

118.    Based on my training, experience, and familiarity with the investigation, I believe STOVALL was informing JAMES that he had just purchased six pounds of methamphetamine for them to sell.  At the time of the conversation, STOVALL was in the area of Benton Harbor and JAMES was in the area of Kalamazoo according to location information on the **TARGET PHONES** obtained pursuant to a warrant.  When STOVALL said, "I'm finna send these six bows over there and run through them bitches," he was informing JAMES that he was going to send six pounds from Benton Harbor to Kalamazoo.  "Bow" is short for "elbow," which is a street term for a pound.

119.    On August 9, 2018, at approximately 10:46 a.m., investigators conducting electronic surveillance intercepted a call (Session #36) from **TARGET PHONE 1** to **TARGET PHONE 2**.  Below is an excerpt of the conversation:

STOVALL:            You done with that one?

JAMES:              Nah, hell no, I'm working through it.  I, I was just making sure everything was copastetic though.

STOVALL:            I got 'em-I got 'em on Stadium

JAMES:              Oh, alright, alright, alright.  That's all you had to let me know then so I know where to go.

120.    Based on my training, experience, and familiarity with the investigation, I believe STOVALL was inquiring from JAMES how the distribution of the six pounds was going and letting him know the location of the other pounds of methamphetamine.  When STOVALL asked, "You done with that one?" STOVALL was asking if JAMES had finished distributing the first pound.  JAMES told STOVALL he had not sold all of that pound yet.  STOVALL then told JAMES the rest of the pounds were on Stadium.  STOVALL previously referred to INDIVIDUAL A's residence, **Subject Premises 5**, as "Stadium," likely because Lakesedge Drive runs off of Stadium Drive and the apartment complex is called Stadium Drive Apartments.

**R.      August 10 and 11, 2018: STOVALL Picks Up Money and Drops off Methamphetamine to ARMSTRONG and INDIVIDUAL U**

121.    On August 10, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #129) at approximately 7:55 p.m. between STOVALL and ARMSTRONG, using (269) 220-2267.  Below is an excerpt from the conversation:

ARMSTRONG:      Hello?

STOVALL:        What's up OG?

ARMSTRONG:      Uh, no, uh, you wanna come by and, uh, pick up all this moolah?

STOVALL:        Shit, I'm prob—I'm prolly, I ain't gone be, I'm prolly, I don't know when I'm, I don't know when I'ma be, I don't know when I'ma be back up man.  What you got right now?

ARMSTRONG:      Uh nothing.

STOVALL:        Everything gone?

ARMSTRONG:      Huh?

STOVALL:        I said everything gone?

ARMSTRONG:       Yeah, well, no, no, no, not everything but I got, I got about 1500 for you right now.  I got to stop by a couple places I might have more than that later, but uh.

122.    Based on my training, experience, and knowledge of the investigation, I believe ARMSTRONG was arranging a time to meet with STOVALL to provide payment for past methamphetamine and receive more methamphetamine to sell.  When ARMSTRONG said "Moolah," he meant money.  ARMSTRONG specified that he had $1,500 for STOVALL, which is the price of approximately four ounces of methamphetamine in this DTO.  Also in the conversation, when STOVALL asked ARMSTRONG, "Everything gone?" he was inquiring if all of the methamphetamine he previously sold ARMSTRONG was gone.

123.    On August 11, 2018, investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #159) at approximately 12:54 p.m. between STOVALL and ARMSTRONG, using (269) 220-2267.  Below is an excerpt from the conversation:

ARMSTRONG:       Hello?

STOVALL:       What's up OG?

ARMSTRONG:       What's up?

STOVALL:       I was seeing what was good with you.

ARMSTRONG:       You coming over?

STOVALL:       Yeah.

ARMSTRONG:       Alright.  Uh, Bobby here

124.    Based on my training, experience, and familiarity with the investigation, I believe this conversation was a continuation of the previous conversation regarding the money pick-up and methamphetamine delivery from the day prior.  Also, when ARMSTRONG said, "Bobby

here," I believe he was referring to INDIVIDUAL U, a previously identified methamphetamine dealer for the DTO.  This belief was corroborated by surveillance of ARMSTRONG's residence which showed STOVALL arrive and meet with ARMSTRONG and INDIVIDUAL U at approximately 2:17 p.m.  After going inside ARMSTRONG's residence for approximately six minutes, STOVALL then left in a black SUV.  I believe STOVALL dropped off more methamphetamine to ARMSTRONG to continue to sell.

**S.** **August 17, 2018: JAMES and STOVALL Discuss the Locations of Two Firearms**

125.    On August 17, 2018, at approximately 10:41 a.m., investigators conducting electronic surveillance intercepted a call (Session #687) between STOVALL, using **TARGET PHONE 1**, and JAMES, using **TARGET PHONE 2**.  Below is an excerpt of the conversation:

| | |
|---|---|
| JAMES: | . . . when I had, what's his name, got the gun out of there anyways, I'm like damn, it's something just telling me like, don't leave nothing in the room with this nigga, man, cause we will wake up this this nigga be gone and anything. |
| STOVALL: | Which gun, the draco? |
| JAMES: | Naw, the mac, I got the drac out the crib already man, Boont got that bitch out the crib already. |
| STOVALL: | Where y'all put that bitch at? |
| JAMES: | Boont got it put up at his house.  I'm thinking in my head, like damn, I know this nigga man, wake up, this shit will be gone. |
| STOVALL: | Where y'all put the mac at? |
| JAMES: | Shit, I'm gonna put the mac up at my house and shit. |
| STOVALL: | Oh ok. |

126.    Based on my training, experience, and knowledge of the investigation, I believe JAMES and STOVALL were discussing the new locations JAMES moved two firearms, "the draco" and "the mac," which were previously located at **Subject Premises 1**.  When JAMES said, "Boont got it put up at his house," I believe he was telling STOVALL that ESHAWN WHITESIDE put the "draco" firearm in **Subject Premises 6**, WHITESIDE's residence.  When JAMES said, "I'm gonna put the mac up at my house and shit," he meant he was taking the "mac" firearm to his residence, which investigators believe to be **Subject Premises 4**.

**T.      August 21, 2018: JAMES Gives a Pound of Methamphetamine to D. HORN and BRAXTON**

127.    On August 21, 2018, while conducting electronic surveillance of **TARGET PHONE 1**, used by JAMES, investigators intercepted a call (Session #7801) between INDIVIDUAL V and JAMES.  The call occurred at approximately 4:51 p.m., with INDIVIDUAL V using telephone number (512) 748-0441.  Below is an excerpt of the conversation:

INDIVIDUAL V:    Crazy.

JAMES:    Man, I had, I had the umm, I had the motherfucker go some shit, go somewhere and get some shit, this shit umm.

INDIVIDUAL V:    Yeah.

JAMES:    Its way, way better though, but I—

INDIVIDUAL V:    I.

JAMES:    Have to get—

INDIVIDUAL V:    Fucking hope so.

JAMES:    Yeah, its way way better but I, I, I'm gonna need like four a piece for this shit though.

INDIVIDUAL V:        You ahh, need what did you say?

JAMES:               I'm gonna need like four hundred a piece for 'em though,this time.

INDIVIDUAL V:        Jeeez, I don't know.  I mean uh. [U/I] see what I can come up with.

JAMES:               It's, it's, it's, straight fire, there ain't gonna nothin' add, nothin' on there, ain't no, it's straight glass.

128.    Based on my training, experience, and knowledge of the investigation, I believe that when JAMES said, "I had the motherfucker go some shit, go somewhere and get some shit," he meant he had a third party get a supply of crystal methamphetamine for him.  I further believe that when JAMES said, "Its way, way better though," he meant the quality of the crystal methamphetamine was better than the crystal methamphetamine JAMES had sold her in the past. JAMES went on to say, "I'm gonna need like four hundred a piece," which I believe meant JAMES was going to sell INDIVIDUAL V each ounce of crystal methamphetamine for $400. Then JAMES said, "It's, straight fire, there ain't gonna nothin' add, nothin' on there, aint no, it's straight glass."  I believe JAMES meant that the crystal methamphetamine was pure and did not have anything added into it which would dilute the purity.  On some occasions, drug traffickers will add to or "cut" controlled substance in order to increases the profits without increasing the amount of controlled substance they would have to purchase.

129.    At approximately 4:53 p.m., JAMES, on **TARGET PHONE 1**, made an intercepted call (Session #7803) to KIRBY, using phone number (269) 348-6323.  Below is an excerpt of that conversation.

KIRBY:               What's good?

JAMES:               Shit, I'll be back around a little later. I'ma be straight.

68

KIRBY:              Alright.

JAMES:              Alright.

130.    Based on my training, experience, and knowledge of the investigation, I believe that when JAMES said, "I'll be back around a little later. I'ma be straight," he meant that he would be in Kalamazoo later and he would have some crystal methamphetamine for her.

131.    At approximately 4:53 p.m., JAMES, on **TARGET PHONE 1**, text messaged (Session #7805) BAGLEY, using phone number (269) 303-9591.  The text read: "Call me I got some pure shit on deck no cut at all."  Based on my training, experience, and knowledge of the investigation, I believe JAMES was telling BAGLEY that he had highly pure crystal methamphetamine that he wanted to sell.

132.    At approximately 7:24 p.m., INDIVIDUAL J, using phone number (269) 252-3123, had an intercepted call (Session #7842) with JAMES, on **TARGET PHONE 1**.  Below is a transcript of the conversation.

JAMES:              Hello?

INDIVIDUAL J:     Come on, I'm outside.

133.    At the time of the above call, cell phone location information obtained pursuant to a search warrant indicated **TARGET PHONE 1** used the same tower and sector in which **Subject Premises 11** is located. At approximately 7:25 p.m., investigators observed a blue Kia Optima rental car leave **Subject Premises 11**.  At approximately 7:38 p.m., investigators observed the Kia Optima drive into the BP gas station at 202 N. Fair Avenue in Benton Harbor and drive up to a pump.  Investigation observed INDIVIDUAL J in the driver's seat and JAMES in the passenger seat of the Kia Optima.  Investigators did not observe JAMES or INDIVIDUAL

J meet with anyone at the gas station.  From the gas station, investigators observed the Kia

Optima enter onto eastbound Interstate 94 at approximately 7:43 p.m.  Investigators maintained

surveillance on the Kia Optima until it arrived at **Subject Premises 1** at approximately 8:25 p.m.

JAMES then exited the front passenger seat and walked into **Subject Premises 1** carrying a large

plastic bag.

134.    On August 21, 2018, at approximately 8:18 p.m., investigators conducting

electronic surveillance on **TARGET PHONE 1** intercepted a call (Session #7858) between

JAMES and TREMAIN BRAXTON, using (269) 487-8138.[24]  Below is an excerpt from the

conversation:

| | |
|---|---|
| BRAXTON: | Hello? |
| JAMES: | Smile Dog? |
| BRAXTON: | Yea? |
| JAMES: | Where you at bitch? |
| BRAXTON: | I'm on the north. |
| JAMES: | Ah, bitch what's y'all doin? |
| BRAXTON: | Shit, I just got here. What, uh, you got that chunk joint, it's all chunky? |

[24] BRAXTON has been identified as the user of the 8138 number through the content of intercepted communication and physical surveillance.  During intercepted communications between 8138 and **TARGET PHONES 1** and **2**, JAMES and STOVALL consistently refer to the user of 8138 as "Smile Dog."  From previous investigations, investigators were aware that BRAXTON's nickname was "Smile Dog."  Also, STOVALL has multiple photographs on his publicly available Facebook page with BRAXTON and him together.  In addition, on multiple days of surveillance including August 22, 2018, investigators have observed BRAXTON either in places or with people corresponding with communications made with or about the user of the 8138 number.

JAMES:               Yea yea yea yea.

BRAXTON:         Aight, that bitch gone, man.  I'm fittin, uh, where you at?

JAMES:               I'm over here, I'm fittin to pull up over Neisha house.

BRAXTON:         Aight.

135.    Based on my training, experience, and knowledge of the investigation, I believe BRAXTON was arranging to pick up a pound of methamphetamine from JAMES at **Subject Premises 1**.  "Chunk" or "chunky" are terms consistently used by this DTO to refer to high quality methamphetamine.  A "joint" is one of the terms used by this DTO to refer to a pound. When BRAXTON said, "that bitch gone," he meant that he already had a buyer lined up for the pound of methamphetamine.

136.    At approximately 8:28 p.m., investigators observed a rented 2018 Dodge Journey, bearing Michigan license plate DVL9412, park in front of **Subject Premises 1**.  According to rental car company records, that Journey had been rented by TREMAIN BRAXTON, listing an address of 146 McCord Street in Benton Harbor.  Minutes prior to the Journey's arrival, investigators observed JAMES enter into **Subject Premises 1**.  D. HORN, the passenger in the Journey, exited the vehicle and went inside **Subject Premises 1**.  BRAXTON, the driver of the vehicle, lingered around the exterior of **Subject Premises 1** while D. HORN was inside.  At approximately 8:37 p.m., D. HORN walked out of **Subject Premises 1** and entered into the Journey, which drove away.

137.    Investigators followed the Journey to the parking lot of Jack's Party Store located at 1601 East Stockbridge Avenue in Kalamazoo.  Investigators observed BRAXTON meet with the driver in a rented 2018 Ford Mustang, bearing Michigan license plate DXB2262, and conduct

a short transaction with the driver inside the Mustang.  When BRAXTON exited the Mustang

and walked to his Journey, he was holding a paper bag that was folded over in the shape of a

stack of dollar bills.  Both vehicles then left the parking lot.  A short time later, a Kalamazoo

Department of Public Safety marked unit attempted to conduct a traffic stop on the Mustang.

However, the driver of the Mustang fled and was not pursued.

**U.    August 23 to 28, 2018: JAMES Travels to Purchase Methamphetamine from DUNN and Two Packages are Mailed in Return**

138.    On August 23, 2018, agents reviewed location information, obtained pursuant to a

warrant, for JAMES's **TARGET PHONE 1**.  At around 7:00 a.m., **TARGET PHONE 1** was in

greater Chicago.  At approximately 11:30 a.m., **TARGET PHONE 1** was in Seattle,

Washington.  At approximately 3:18 p.m., **TARGET PHONE 1** was in Phoenix.

139.    On the same day, at approximately 3:47 p.m., agents observed DUNN leave his

residence, 1918 South 80th Avenue in Phoenix driving a white 2018 Chevrolet sedan, which is a

rental car according to its registration.

140.    At approximately 4:03 p.m., JAMES, on **TARGET PHONE 1**, called

INDIVIDUAL D, using phone number (269) 903-5288 (Session #8121).  Below is an excerpt of

the conversation.

> JAMES:              Oh, send me the info to the crib and your name and shit.
>
> INDIVIDUAL D:    Alright.

141.    Based on my training, experience, and knowledge of the investigation, I believe

that JAMES was asking INDIVIDUAL D to send her address and name for the purpose of

mailing a package of methamphetamine when he said, "Send me the info to the crib and your

name." INDIVIDUAL D's address is 1525 Bacon Avenue, Apartment 6, Portage, Michigan, which is the same location where the package of suspected crystal methamphetamine temporarily went missing on July 6, 2018, as described above. That package had been shipped to INDIVIDUAL D at that address.

142. At approximately 4:06 p.m., investigators intercepted a call (Session #8123) where DUNN, using telephone number (623) 216-7035, attempted to make contact with JAMES, on **TARGET PHONE 1**, however the call did not connect.

143. At approximately 4:09 p.m., agents observed DUNN drive the Chevy rental car to the arrivals section of the Phoenix International Airport in Terminal 2. JAMES and an unidentified male ("UM"), who is black, entered DUNN's Chevy rental car. Agents maintained surveillance on the Chevy rental car driven by DUNN and it arrived at DUNN's residence, 1918 South 80th Avenue. Agents observed DUNN, JAMES, and the UM exit the rental car and walk into DUNN's residence at approximately 4:32 p.m.

144. On August 26, 2018, at approximately 8:50 p.m., investigators conducting electronic surveillance on **TARGET PHONE 1** intercepted a call (Session #8574) between JAMES and DUNN, using (623) 216-7035. Below is an excerpt from the conversation:

| | |
|---|---|
| DUNN: | So I did it that Saturday early, that early, early, so I know some, I know it left up out of there. So, I don't know if, if they move Saturday, like, it's just they don't deliver on Sat, on Sunday, but they still move on Sundays, so it might be there Monday. But if they, if they, if they don't move on Sunday, then it be Tuesday, but— |
| JAMES: | Yea, that's what bro was telling me, most likely Tuesday. |
| DUNN: | Ya but just, just in case when you get up, get up tomorrow like 11 whatever, just, uh, call check on them bitches. |

73

JAMES:          Alright.

DUNN:           Alight, yep. Alright G.

145.    Based on my training experience and knowledge of the investigation, I believe DUNN and JAMES were discussing the arrival day of a large shipment of methamphetamine. When DUNN said, "if they don't move on Sunday, then it be Tuesday," he meant that if the United States Post Office did not partially transport the shipment of methamphetamine on Sunday, then it would arrive on Tuesday.  DUNN further instructed JAMES to "call and check on them bitches," meaning JAMES should check the status of the packages of methamphetamine.

146.    On August 27, 2018, USPIS located two packages in the Kalamazoo area that had been shipped from the Phoenix area.  Both return addresses listed the same person, "Taylor Jones," at 4315 E Darrel Road, 85339.  USPIS has no prior record of anyone by that name receiving mail at that address.  One of the packages was addressed to INDIVIDUAL D at 1525 Bacon Avenue #6, Portage, MI 49002.  USPIS intercepted the August 27 package, searched it pursuant to a warrant on August 28, and located 3 pounds, 3 ounces of crystal methamphetamine, which field-tested positive for methamphetamine.

147.    The second package, which weighed approximately 4 pounds, 11 ounces, was sent to INDIVIDUAL N at 760 S. Drake Rd #112, Kalamazoo, MI 49009.  INDIVIDUAL N and this address were previously used on July 27, 2018, to receive a package of methamphetamine, as described above.  By the time USPIS identified this package, it had already been delivered to that address.

148.    STOVALL and FARMER discussed the incoming packages.  On August 24, 2018, at approximately 7:34 p.m., FARMER used (470) 955-0097 to communicate (Session

74

#1517) with STOVALL on **TARGET PHONE 2** regarding pounds of methamphetamine.

Below is an excerpt of the conversation:

> FARMER:    You get, did, did you get tight on the joints you was waitin' on?
>
> STOVALL:   Hell nah, bitch still ain't here man.
>
> FARMER:    Man I'm straight on them bitches!
>
> STOVALL:   Shit, bitch. Shit, bitch. Let me get one 'em bitches man.

149.    Based on my training, experience, and familiarity with the investigation, I believe FARMER was asking STOVALL if he had received his multi pound crystal methamphetamine shipment when he said, "Did you get tight on the joints, you was waitin' on?" The word "joint" has been utilized by the DTO as coded speech meaning a pound of crystal methamphetamine. FARMER was asking if STOVALL had received a multi-pound shipment of methamphetamine. STOVALL then said, "Hell nah, bitch still ain't here man." I believe STOVALL meant the shipment of crystal methamphetamine had not yet arrived. I further believe that when FARMER said, "Man I'm straight on them bitches," he was indicating to STOVALL that he had pounds of crystal methamphetamine. STOVALL's response was, "Let me get one 'em bitches man." I believe STOVALL meant he wanted FARMER to provide one of the pounds of crystal methamphetamine to him.

150.    Also on August 24, 2018, at approximately 8:27 p.m., FARMER again used (470) 955-0097 to communicate (Session #1524) with STOVALL. Below is an excerpt of the conversation:

75

STOVALL:            Them bitches is hit, man.  At least bring one of them
                   bitches [U/I] to do with that bitch.

FARMER:            Listen bro. I just told you, talking he had two of em coming
                   there nigga. [U/I] I'm coming. I told them people I'm
                   coming. Do what you said nigga.

STOVALL:            Alright.

151.    Based on my training, experience, and familiarity with the investigation, I believe

STOVALL and FARMER were discussing the distribution of two pounds of methamphetamine.

STOVALL said, "them bitches is hit, man. At least bring one of them bitches."  I believe

STOVALL was telling FARMER that he could quickly sell the methamphetamine.   FARMER

responded that he is coming to STOVALL with two pounds and it will be up to STOVALL to

ensure the two pounds are sold.  However, investigators do not believe that FARMER sold the

two pounds to STOVALL because there were no additional communications to arrange a

meeting.

## III.    Probable Cause for the Premises to be Searched

152.    The foregoing narrative has supplied probable cause for some of the locations to

be searched, but in the paragraphs that follow I summarize and supplement the facts supporting

the search of each location.

### A.    Subject Premises 1: 612 Locust Street, Kalamazoo, Michigan (DTO Distribution Location)

153.    As set forth in Attachment A for the Application for a search warrant for 612

Locust Street, Kalamazoo, Michigan 49002, the property to be searched is commonly known as

612 Locust Street, City of Kalamazoo, County of Kalamazoo, State of Michigan.  The primary

structure on **Subject Premises 1** is a light yellow two story wood framed, single family

residence with white trim.  The numbers "612" are located above the front door facing Locust

Street.  It is further described as the 2nd structure south of W. Walnut Street on the west side of the roadway.  This residence has an asphalt drive on the north side of the residence. Furthermore, there is a white and green porch on the front of the residence facing Locust Street.

154.    In addition to the facts described in this section, **Subject Premises 1** is referenced above in Paragraphs 75, 78, 80, 87, 99, 108, 126, 133, 135, and 136, as well as below in Paragraphs 183, 212, 213, 216, 218, 219, 257, and 258.

155.    Over the past month, the DTO has moved its base of operation from 922 S. Park Street to **Subject Premises 1**.  The DTO now primarily uses the Crow's Nest parking lot to conduct drug deals.  The Crow's Nest is a restaurant located at 816 S. Westnedge Avenue in Kalamazoo, which is an approximate five-minute walk from **Subject Premises 1**.  Members of the DTO, including JAMES and STOVALL, have been observed at least thirty times walking, driving vehicles, or riding bicycles to meet with their distribution network at the Crow's Nest. On many occasions, the DTO members have left directly from **Subject Premises 1** and arrived at the Crow's Nest without deviation from their route or stopping at a secondary location.   For nearly all of these meetings, there have been intercepted calls in which the DTO's distributors have asked for specific quantities of the suspected crystal methamphetamine.  Examples of these meeting are described above in this continuation.  In addition, two such instances occurred on July 31, 2018, and August 10, 2018.

156.    On July 31, 2018, at approximately 7:31 p.m., STOVALL, using **TARGET PHONE 2**, had a conversation (Session #3242) with UMINN, using phone number (269) 348-6239.  Below is an excerpt of the conversation.

UMINN:             I need like um a half right now.

STOVALL:           Alright come through.

UMINN:            Alright, what you want me to do call you when I get towards the
                  Crow?

STOVALL:          Yah.

UMINN:            Alright bet.

157.   Based on my training, experience, and knowledge of the investigation, I believe that UMINN was asking STOVALL for a half a pound of crystal methamphetamine and that they were going to meet at the Crow's Nest.

158.   Investigators established surveillance at the Crow's Nest and observed a silver Ford Taurus X.  The Taurus X parked in the lot and UMINN was observed exiting the front passenger seat.  UMINN walked around the parking lot for a few minutes and then STOVALL was observed exiting **Subject Premises 1**.  UMINN and STOVALL were observed meeting up briefly in the parking lot and then walking away from the parking lot west down W. Vine Street. They were out of view of the surveillance team for a very short period of time.  Then UMINN walked back to the parking lot and entered into the front passenger seat of the Taurus X, and STOVALL walked back to **Subject Premises 1**.

159.   On August 10, 2018, at approximately 1:42 p.m., UMINN, using phone number (269) 348-6239, called (Session #5991) JAMES on **TARGET PHONE 1**.  Below is an excerpt of the conversation.

UMINN:            Are we, are we still good or?

JAMES:            Yeah, I'm still good.

UMINN:            Alright I'll hit, I'll hit you up when I'm down by the Crow's.

JAMES:            Alright.

78

160.    Based on my training, experience, and knowledge of the investigation, I believe that UMINN was asking if JAMES had crystal methamphetamine for him and when JAMES said, "Yeah, I'm still good," he meant that he had the crystal methamphetamine.  Then UMINN told JAMES that he would call him once he arrived at the Crow's Nest.

161.    At approximately 4:31 p.m., UMINN, using phone number (269) 348-6239, called (Session #6014) JAMES on **TARGET PHONE 1**.  Below is an excerpt of the conversation.

| | |
|---|---|
| JAMES: | Naw, I ain't mobile right now, you come and meet me at the Crow? |
| UMINN: | Yeah I can get a ride.  I'm going to go call him right now. |
| JAMES: | Alright, what you own me? |
| UMINN: | Uh, three ten. |
| JAMES: | Alright. |
| UMINN: | Alright, you got another one for me? |
| JAMES: | Yeah. |

162.    Based on my training, experience, and knowledge of the investigation, I believe that when JAMES said, "What you own me?"  JAMES was asking UMINN how much money he was owed for methamphetamine that had been fronted.  UMINN's response was, "three ten," or $310.  At the end of the conversation, when UMINN said, "You got one for me?"  He was asking JAMES for another ounce of crystal methamphetamine.

163.    At approximately 4:53 p.m., investigators observed a white Buick LeSabre drive into the parking lot at the Crow's Nest.

164.    At approximately 4:55 p.m., investigators observed JAMES ride away from **Subject Premises 1** on a bicycle.

165.    At approximately 4:58 p.m., investigators observed UMINN meet with JAMES in the parking lot of the Crow's Nest.  JAMES was riding a bicycle at the time.

166.    At approximately 5:01 p.m., investigators observed JAMES ride the bicycle up the front walkway at **Subject Premises 1**.

**B.    Subject Premises 2: 3327 Dearborn Avenue, Kalamazoo, Michigan (DAVID UMINN's residence)**

167.    As set forth in Attachment A for the Application for a search warrant for 3327 Dearborn Avenue, Kalamazoo, Michigan 49048, the property to be searched is commonly known as 3327 Dearborn Avenue, Township of Kalamazoo, County of Kalamazoo and State of Michigan.  The primary structure on **Subject Premises 2** is a white single story family residence with blue shutters and trim.  The numbers "3327" are located to the right of the front door affixed to the residence.  It is further described as the second structure west of Craft Avenue on the north side of Dearborn Avenue.  This residence has a paved driveway to an attached two car garage.

168.    During the course of this investigation, investigators have followed UMINN to **Subject Premises 2** after he purchased methamphetamine on at least five occasions in July and August 2018.  For example, on July 18, 2018, UMINN was surveilled from a drug deal back to **Subject Premises 2**, as referenced in Paragraph 79 above.

169.    In addition, on July 31, 2018, investigators surveilled a deal at the Crow's Nest between UMINN and STOVALL, as discussed in Paragraphs 156 and 157.  UMINN left the deal in a silver Taurus X, which was surveilled back to **Subject Premises 2**.  Investigators further

observed UMINN and two other unidentified individuals exit the Taurus X and enter **Subject Premises 2**.

170.    Another example occurred on August 10, 2018, where UMINN and JAMES coordinated a deal to purchase suspected crystal methamphetamine during intercepted phone conversations, as detailed above in Paragraphs 159 through 166.  Investigators observed JAMES and UMINN meet in the parking lot of the Crow's Nest and complete the suspected methamphetamine transaction.

171.    At approximately 4:59 p.m., investigators observed UMINN get back into a white Buick LeSabre.  Investigators surveilled the white Buick until it arrived at **Subject Premises 2**, at approximately 5:13 p.m.  Investigators then observed UMINN exit the white Buick and walk into **Subject Premises 2**.

172.    Additionally, a commercial database (Accurint) shows that **Subject Premises 2** is a residence that is associated with DAVID UMINN.  A check of the State of Michigan Bridge Card system revealed that INDIVIDUAL W had a Bridge card registered with the address of **Subject Premises 2**.  INDIVIDUAL W has been intercepted on the wire talking to JAMES about UMINN owing JAMES money.  INDIVIDUAL W self-identified herself to JAMES as "David's old lady" and is therefore believed to be UMINN's girlfriend.  Finally, **Subject Premises 2** is also referenced in Paragraph 242 below.

**C.    Subject Premises 3: 6624 Wright Street, Kalamazoo, Michigan (ROBERT ARMSTRONG's residence)**

173.    As set forth in Attachment A for the Application for a search warrant for 6624 Wright Street, Kalamazoo, Michigan 49048, the property to be searched is commonly known as 6244 Wright Street, Township of Comstock, County of Kalamazoo, State of Michigan.  The

primary structure on **Subject Premises 3** is a one story family dwelling, brown in color with maroon trim.  The numbers "6244" are clearly affixed to the north side of the building.  The main entry door leading into the structure is on the east side of the structure.  It is further described as the second structure east of Metzger Street on the south side of Wright Street.

174.    During the course of this investigation, investigators have followed STOVALL to **Subject Premises 3** to deliver crystal methamphetamine to ARMSTRONG on at least four occasions in July and August 2018.  In Paragraph 76 above, I describe one instance where investigators identified a delivery at **Subject Premises 3** in the early morning hours of July 19, 2018, through surveillance and intercepted communications.

175.     On July 17, 2018, at approximately 12:52 p.m., STOVALL, using **TARGET PHONE 2**, called (Session #1692) ARMSTRONG, using phone number (269) 220-2751.  Below is an excerpt of the call.

| | |
|---|---|
| STOVALL: | Hello. |
| ARMSTRONG: | Yeah, Hey um, I want drop something off. I don't need anything but I just wanted to get rid of some this for ya. |
| STOVALL: | Alright. |
| ARMSTRONG: | I got to go to Boost and pay a phone bill, in about a half hour, forty-five minutes. |

176.    Based on my training, experience, and knowledge of the investigation, I believe that when ARMSTRONG said, "I just wanted to get rid of some this for ya," he meant that he wanted to give STOVALL some money as payment for fronted crystal methamphetamine.

177.    At approximately 4:49 p.m., investigators observed ARMSTRONG driving a maroon Jeep to the Boost Mobile store in Kalamazoo.

82

178.    At approximately 6:05 p.m., STOVALL, using **TARGET PHONE 2**, spoke with (Session #1718) ARMSTRONG, using phone number (269) 220-2751.  Below is an excerpt of the call.

ARMSTRONG:    I can pry be down there in 15-20 minutes.

STOVALL:    You, you talking the house? Or you talking bout over this way?

ARMSTRONG:    Well Uhh ya, I'll be at my house 15 minutes.

STOVALL:    Alright here I come.

179.    Based on my training, experience, and knowledge of the investigation, I believe that STOVALL was going to pick the money up that they had talked about earlier in the day at **Subject Premises 3** when he said, "Alright here I come."

180.    At approximately 6:28 p.m., investigator observed ARMSTRONG arrive at **Subject Premises 3**, driving the maroon Jeep.  ARMSTRONG then exited the Jeep and entered into **Subject Premises 3**.

181.     On July 17, 2018, at approximately 7:48 p.m., STOVALL, using **TARGET PHONE 2**, spoke with (Session #1740) ARMSTRONG, using phone number (269) 220-2751.  Below is an excerpt of the call.

STOVALL:    Uh, uh, uh, I'm going to pull up right now bro.

ARMSTRONG:    Aight [U/I].

182.    Based on my training, experience, and knowledge of the investigation, I believe that STOVALL told ARMSTRONG that he was driving to **Subject Premises 3**.

183.    At approximately 7:50 p.m., investigators, maintaining surveillance on **Subject Premises 1,** observed INDIVIDUAL F enter the driver seat of his Chrysler 300 and STOVALL

enter the front passenger seat of the Chrysler 300.  The Chrysler 300 then drove away from northbound from **Subject Premises 1**.

184.    At approximately 8:10 p.m., investigators observed the Chrysler 300 arrive in front of the **Subject Premises 3** and STOVALL exited the vehicle.   INDIVIDUAL F then drove away from **Subject Premises 3**.

185.    At approximately 8:11 p.m., investigators observed STOVALL meet with ARMSTRONG in the front yard of **Subject Premises 3**.  Investigators observed STOVALL and ARMSTRONG conduct the transaction.  At approximately 8:12 p.m., STOVALL walked down the street to the waiting Chrysler 300 and entered the vehicle.  ARMSTRONG went into **Subject Premises 3**.

186.    Finally, as detailed in Paragraphs 123 and 124, on August 11, 2018, STOVALL met with ARMSTRONG at **Subject Premises 3** to pick up money from ARMSTRONG's methamphetamine distribution and provide ARMSTRONG additional methamphetamine.

187.    The Michigan Secretary of State's database indicates that ARMSTRONG's current address of record is **Subject Premises 3**.

### D.       Subject Premises 4: 973 Lavette Avenue, Benton Harbor, Michigan (RICHARD JAMES's residence)

188.    As set forth in Attachment A for the Application for a search warrant to search for 973 Lavette Avenue, Benton Harbor, Michigan, the property to be searched is commonly known as 973 Lavette Avenue, City of Benton Harbor, County of Berrien, State of Michigan.  **Subject Premises 4** is further described as a single-story, single family home with gray wood siding and white trim.  The front door is in the southwest corner of the structure, with the numbers "973"

84

affixed above the front door.  It is located on the east side of Lavette and is five buildings south of E. Empire Avenue.

189.    Investigators have identified **Subject Premises 4** as RICHARD JAMES's residence through the following means.  As detailed in Paragraph 99, investigators conducting surveillance observed STOVALL and DYER pick up JAMES from in front of **Subject Premises 4** on July 27, 2018.  Also, JAMES's address of record with the Michigan Secretary of State is **Subject Premises 4**.

190.    During two intercepted phone calls on **TARGET PHONE 1**, JAMES made reference to his residence, and evidence surrounding those calls indicates he was referring to **Subject Premises 4**.  For instance, on July 5, 2018, at approximately 5:22 p.m., JAMES received a call (Session #418) from STOVALL, using **TARGET PHONE 2**.  Below is an excerpt from the conversation:

| | |
|---|---|
| STOVALL: | Man, what's up? |
| JAMES: | I finna, I'm leaving right now, I'm pulling out from my house. |

191.    Based on my training, experience, and knowledge of the investigation, I believe JAMES was telling STOVALL that he was leaving **Subject Premises 4**.  According to the location information obtained pursuant to a search warrant, at the time of this call **TARGET PHONE 1** used the tower and sector in which **Subject Premises 4** falls.

192.    On July 25, 2018, at approximately 5:25 p.m., JAMES received a call (Session #3773) from GOODLOE, using (269) 210-1268.  Below is an excerpt from the conversation:

| | |
|---|---|
| JAMES: | What up? |
| GOODLOE: | Where you at? |
| JAMES: | I'm at the crib. |

GOODLOE:        Where, on, on Lavette?

JAMES:          Yeah.

193.    Based on my training, experience, and knowledge of the investigation, I believe

JAMES was informing GOODLOE that he was located at **Subject Premises 4**.  He initially told

GOODLOE he is "at the crib," meaning his residence.  GOODLOE further clarified with

JAMES that he is referring to **Subject Premises 4**, which is located on Lavette Avenue. JAMES

confirmed this.  Also, the phone location information at the time of this call showed **TARGET**

**PHONE 1** located in the same tower and sector in which **Subject Premises 4** falls.

194.    As detailed in Paragraphs 125 and 126, on August 17, 2018, JAMES transferred a

"mac" from **Subject Premises 1** to **Subject Premises 4**.  Based on my training, experience, and

knowledge of the investigation, I believe a "mac" is a street term for a MAC 10 or MAC 11

compact sub-machine gun.

### E.    Subject Premises 5: 4001 Lakesedge Drive, Apartment E, Kalamazoo, Michigan (INDIVIDUAL A's residence)

195.    As set forth in Attachment A for the Application for a search warrant for 4001

Lakesedge Drive, Apartment E, Kalamazoo, Michigan 49008, the property to be searched is

commonly known as 4001 Lakesedge Drive, Apartment E, City of Kalamazoo, County of

Kalamazoo, State of Michigan.  The primary structure on **Subject Premises 5** is a multi-shade

brown brick with tan vinyl siding, single story, multi-unit residential housing apartments, with

brown trim.  The numbers "4001" are affixed and located on the center portion of the building

with multiple units identified by letter characters from the alphabet.  It is further described to

have the letter "E" affixed above the tan door.  It's location within the complex is the second

townhouse from the most south eastern apartment building in the Stadium Drive Apartment

86

Complex.  There is a common access open parking lot for the residents of the complex directly northwest of the residence.

196.    As described in Paragraph 17, a drug package was sent to INDIVIDUAL A at **Subject Premises 5** in March 2018.  The package contained more than five pounds of suspected methamphetamine, which field-tested positive.  USPIS has identified five more packages shipped to **Subject Premises 5** that fit the same profile as the package that was intercepted: they were shipped from California and weighed between approximately 6.5 and 10 pounds.  The packages, including the seized package described in Paragraph 17, were shipped between September 27, 2017, and March 19, 2018.

197.    INDIVIDUAL A has rented vehicles used by the DTO.  For each of the rentals, INDIVIDUAL A utilized **Subject Premises 5** as the address used for the rental agreement.

198.    In addition, **Subject Premises 5** has been tied to the DTO as described in Paragraphs 87, 97, 98 and 120, above.

199.    The Michigan Secretary of State record for INDIVIDUAL A indicates that INDIVIDUAL A's current address is **Subject Premises 5**.

**F.      Subject Premises 6: 826 Woodbury Avenue, Kalamazoo, Michigan (ESHAWN WHITESIDE's residence)**

200.    As set forth in Attachment A for the Application for a search warrant to search for 826 Woodbury Avenue, Kalamazoo, Michigan, the property to be searched is commonly known as 826 Woodbury Avenue, City of Kalamazoo, County of Kalamazoo, State of Michigan.  The primary structure on **Subject Premises 6** is a two story family dwelling, tan in color with brown trim.  The numbers "826" are clearly affixed to the west side of the building, on the south side of the front door.  The main entry door leading into the structure is on the west side of the structure.

It is further described as the third structure south of Florence Street on the east side of Woodbury Avenue.

201.    During the investigation, WHITESIDE had been surveilled meeting with other members of the DTO on nearly a dozen occasions after coordinating purchases of methamphetamine through either **TARGET PHONE 1** or **TARGET PHONE 2**.  In addition, investigators have identified WHITESIDE's residence to be the **Subject Premises 6** through the following means.

202.    On July 14, 2018, at approximately 4:12 p.m., investigators conducting electronic surveillance on **TARGET PHONE 2** intercepted a call (Session #1422) between STOVALL and WHITESIDE.  The following is an excerpt of their conversation:

| | |
|---|---|
| STOVALL: | Where the fuck you at? |
| WHITESIDE: | Here, uh, Woodbury. |
| STOVALL: | On the bury? |
| WHITESIDE: | Yup. |
| STOVALL: | You still trying to grab that? |
| WHITESIDE: | Yea. |
| STOVALL: | Shit, I'm finna pull up on ya cause I finna go to the Harbor and grab it though bro. I finna have my sister bring it back and shit. |
| WHITESIDE: | Oh you talking about that little P? |
| STOVALL: | Yea. |

203.    Based on my training, experience, and knowledge of the investigation, I believe WHITESIDE and STOVALL were coordinating a future potential deal for a pound of methamphetamine.  For this DTO, "P" has consistently meant a pound from the context of the

communications intercepted.  During this conversation, WHITESIDE tells STOVALL he is located on Woodbury Avenue.

204.    On August 20, 2018, KVET detectives used a CI, hereafter referred to as KVET CI#3,[25] to conduct a controlled purchase of approximately one gram of heroin from WHITESIDE.  KVET CI#3 contacted WHITESIDE on (269) 823-9434, the same number which WHITESIDE used to communicate with **TARGET PHONE 1** and **TARGET PHONE 2** throughout this investigation.  Prior to the purchase, KVET CI#3's handlers searched him or her for contraband, and located no controlled substances, weapons, or money.  WHITESIDE initially directed KVET CI#3 to meet him at **Subject Premises 6,** where WHITESIDE said he was located.  However, shortly before meeting, WHITESIDE changed the location.  KVET CI#3 was surveilled to the meet location.  Investigators then observed KVET CI#3 meet with WHITESIDE and followed him or her back to a pre-designated location.  KVET CI#3 turned over the purchased suspected heroin.  KVET CI#3 was searched again, with no other controlled substances, weapons, or money located.

205.    Investigators obtained a search warrant for historical call detail records with cell tower location information for (269) 823-9434, WHITESIDE's phone, for August 1 through August 15, 2018.  During that timeframe, WHITESIDE made approximately 800 voice calls with

---

[25] KVET CI#3 has been providing information to investigators since May 2018.  KVET CI#3 has provided information in the hope of receiving consideration for pending criminal charges involving possession of methamphetamine and possession of a firearm while in the commission of a felony.  KVET CI#3's criminal history consists of one misdemeanor motor vehicle violation in 2007.  The information provided by KVET CI#3 was proven to be accurate through database checks, information provided by other confidential informants, and intelligence contained in police files.  Investigators have consistently found KVET CI#3's information to be reliable.  KVET has not had any issues with his or her credibility or performance.

approximate geo-location information.  Of those 800 calls, 283 utilized the tower and sector in which **Subject Premises 6** was located.  This tower and sector was utilized over twice as many times as any other tower and sector used during that timeframe.

206.     WHITESIDE's address of record with the Michigan Secretary of State is **Subject Premises 6**.  He also receives mail through United States Postal Service to the **Subject Premises 6**.

207.     Finally, as detailed in Paragraphs 125 and 126 above, on or about August 16, 2018, JAMES provided a "draco" to WHITESIDE at his "house," which investigators believe is **Subject Premises 6**.  Based on my training, experience, and knowledge of the investigation, I believe a "draco" is a street term for a compact, AK-47 style assault rifle.

### G.     Subject Premises 7: 4420-B Lilac Lane, Apartment #143, Kalamazoo, Michigan (AARON RIMPSON's residence)

208.     As set forth in Attachment A for the Application for a search warrant for 4420-B Lilac Lane, Apartment #143, Kalamazoo, Michigan 49006, the property to be searched is commonly known as 4420-B Lilac Lane, Apartment #143, Kalamazoo, Michigan, County of Kalamazoo, State of Michigan.  The primary structure on **Subject Premises 7** is a beige three-story multiple family apartment building with green trim, first floor exterior patios and second/third floor balconies.  The numbers "4420-B Apartments 133-143" are affixed on the locked green exterior door facing the south, which opens to a common stairwell.  Apartment 143 is located on the third floor, the apartment door is the second door on the right side of the hallway, and the door is brown in color, with the numerals "143" affixed to the center of the door written on a silver knocker.  It is further described as the fifth parking lot entrance to the east,

from the intersection of W.  Michigan and Lilac Lane.  Building 4420-B is directly to the north of the parking lot entrance, on the east side of the U-shaped parking lot.

209.    During the course of this investigation, investigators have followed RIMPSON while he drove his white GMC SUV.  Investigators surveilled RIMPSON or tracked his vehicle back to **Subject Premises 7** after drug deals with JAMES or STOVALL on at least three occasions in July and August 2018.

210.    For example, on July 28, 2018, investigators were tracking RIMPSON's GMC with a GPS device, pursuant to a warrant.  At approximately 11:27 a.m., the GPS tracker on RIMPSON's GMC indicates that it left Lilac Lane.  The GMC SUV arrived at the 1400 block of Princeton on the north side of Kalamazoo and stopped for 58 seconds.

211.    At approximately 11:39 a.m., RIMPSON, using phone number (269) 447-4521, spoke (Session #4248) with JAMES, using **TARGET PHONE 1**. There were technical difficulties with the call such that investigators were unable to hear JAMES's end of the conversation, but RIMPSON's end was recorded and below is an excerpt of that call.

RIMPSON:          I said when you gonna be ready?

JAMES:              [No audio]

RIMPSON:          Shit . . . you over there at the spot?

JAMES:              [No audio]

RIMPSON:          I'll come get you. I'll be over there in a minute. Alright.

212.    Based on my training, experience, and knowledge of the investigation, I believe when RIMPSON asked JAMES, "when you gonna be ready?"  RIMPSON was asking if JAMES had crystal methamphetamine.  When RIMPSON asked, "You over there at the spot?" I believe he was referring to **Subject Premises 1**.

91

213.    At approximately 12:04 p.m., the GMC arrived at **Subject Premises 1**. At approximately 1:03 p.m., the GMC left **Subject Premises 1** and drove directly back to the parking lot of **Subject Premises 7**.

214.    On July 29, 2018, at approximately 11:36 a.m., RIMPSON, using phone number (269) 447-4522, called (Session #4409) JAMES, on **TARGET PHONE 1**. Below is an excerpt of the call:

| | |
|---|---|
| JAMES: | I'm on Clinton |
| RIMPSON: | Hell yeah. Yeeaah. |
| JAMES: | [U/I] |
| RIMPSON: | Ahh, uh. You got a zip? |
| JAMES: | Yep.  I got one. |
| RIMPSON: | Aight. |
| JAMES: | I'm a call you when I get to the spot. [U/I] I know you prolly in traffic [U/I]. |
| RIMPSON: | You say what? |
| JAMES: | You in traffic? |
| RIMPSON: | You say what?  You got one? |
| JAMES: | Yeah bitch.  You in traffic? |
| RIMPSON: | Yeah, yep. |
| JAMES: | Alright.  Come up, I'm on Clinton.  We's out on a porch. [U/I]. |
| RIMPSON: | Alright. |

215.    Based on my training, experience, and knowledge of the investigation, I believe when RIMPSON said, "You got a zip?" He was asking JAMES for an ounce of crystal methamphetamine.  JAMES responded that he "got one."  JAMES was telling RIMPSON that he

had an ounce of crystal methamphetamine.  Later in the call, JAMES told RIMPSON to come to Clinton and meet with him there.

216.    At approximately 11:57 a.m., according to the GPS tracker, RIMPSON's GMC left **Subject Premises 7** and drove to Daysha's Party Store at the intersection of Douglas and North Street.  RIMPSON's GMC then drove directly to 511 Clinton and arrived at approximately 12:38 p.m.  RIMPSON's GMC left 511 Clinton at approximately 1:24 p.m. and drove to **Subject Premises 1**.  At approximately 1:47 p.m., RIMPSON's GMC left **Subject Premises 1**.  RIMPSON's GMC then drove back to the parking lot at **Subject Premises 7** and arrived at approximately 1:58 p.m.

217.    On August 10, 2018, at approximately 3:23 p.m., RIMPSON, using phone number (269) 449-4349, made contact (Session #6007) with JAMES, on **TARGET PHONE 1**.  Below is an excerpt of the call:

| | |
|---|---|
| JAMES: | I'm at the crib.  I mean I'm on Locust. |
| RIMPSON: | Alright.  You bring the, um, ship in bitch.  I ain't even been out there like that really, bro.  Like trying to drive and shit you know, so you I got it, but they ain't gonna do nothing to the motherfucker. |
| JAMES: | Hell yeah, bitch, I need you to help me run through this shit. |
| RIMPSON: | Shit, I got some plays right now. |
| JAMES: | Hell yeah, I need help bitch, there's somebody be callin' me right now, bitch.  But yea, go and line your people up, bitch, I got it. |
| RIMPSON: | Shit, alright, I'm finna, um, damn, I sure need like two of them right, real—. |

218.    Based on my training, experience, and knowledge of the investigation,  I believe JAMES meant that he wanted RIMPSON to help him sell the crystal methamphetamine that he

had just received when he said, "I need you to help me run through this shit." RIMPSON's response was, "I got some plays right now," which meant he had customers lined up. Later in the conversation, RIMPSON said, "I sure need like two of them right, real—." I believe RIMPSON meant that he wanted two ounces of crystal methamphetamine from JAMES. Earlier in the conversation, RIMPSON asked JAMES where he was and JAMES said he was at **Subject Premises 1**.

219. On August 10, 2018, at approximately 5:44 p.m., investigators observed AARON RIMPSON arrive at **Subject Premises 1** in his white GMC and observed him walk up to **Subject Premises 1**. After approximately two minutes, RIMPSON left **Subject Premises 1** and entered into his white GMC SUV. Investigators followed RIMPSON until he stopped at a gas station near **Subject Premises 7**. Investigators believed that RIMPSON was driving in a manner to detect the presence of law enforcement behind him, called "cleaning," when he drove into the gas station and stayed for a very short period of time. Investigators drove ahead to the parking lot of **Subject Premises 7** to await RIMPSON's arrival in the white GMC SUV. RIMPSON had only stayed at the gas station for approximately one minute and he arrived in the parking lot of **Subject Premises 7** shortly after investigators.

220. The Michigan Secretary of State's database indicates that AARON RIMPSON's current address is **Subject Premises 7**. Additionally, RIMPSON uses **Subject Premises 7** as his address of record for the Kalamazoo County Probation Office.

### H.    Subject Premises 8: 4259 Lakesedge Drive, Apartment A, Kalamazoo, Michigan (MICHAEL MARCON's residence)

221. As set forth in Attachment A for the Application for a search warrant for 4259 Lakesedge Drive, Apartment A, Kalamazoo, Michigan 49008, the property to be searched is

94

commonly known as 4259 Lakesedge Drive, Apartment A, City of Kalamazoo, County of Kalamazoo, State of Michigan.  The primary structure on **Subject Premises 8** is a multi-shade brown brick with tan vinyl siding, single story, multi-unit residential housing apartments, with brown trim.  The numbers "4259" are affixed and located on the far left portion of the building with multiple units identified by letter characters from the alphabet.  It is further described to have the letter "A" affixed above the tan door.  It's location within the complex is the fifth apartment building in from the main entrance off of Stadium Drive in the Stadium Drive Apartment Complex.  There is a common access open parking lot for the residents of the complex directly northwest of the residence as well as the northeast of the residence.

222.     As discussed in Paragraphs 84 through 86, on July 22, 2018, BAGLEY told STOVALL he would contact MICHAEL MARCON to see if he could give STOVALL $1,500.  Also as described there, MARCON delivered crystal methamphetamine in three controlled deliveries earlier in 2018.

223.     On July 9, 2018, at approximately 5:02 p.m., BAGLEY, using phone number (269) 303-9591 called (Session #1095) JAMES, using **TARGET PHONE 1**.  During the call, JAMES said, "What you trying to do?" and BAGLEY said, "Probably a quarter pound, maybe a couple more."

224.     Based on my training, experience, and knowledge of the investigation, I believe that BAGLEY asked JAMES for a quarter pound of crystal methamphetamine.

225.     At approximately 5:36 p.m., investigators observed a gray 2010 Chevrolet Equinox arrive at 922 S. Park Street.  BAGLEY exited the Equinox and entered the rear door of 922 S. Park Street.

226.    At approximately 5:40 p.m., investigators observed BAGLEY exit the rear door of 922 S. Park Street and enter into the Equinox.  The gray Equinox then left the area.  At approximately 5:42 p.m., investigators observed the gray Equinox being followed by a blue 2007 Saturn Aura, which was driven by MICHAEL MARCON and registered to **Subject Premises 8**.

227.    Both the Equinox and the Saturn drove into the Stadium Drive Apartment Complex where **Subject Premises 8** is located.  However, investigators were not able to see which location they went to at that time.

228.    The Saturn is registered to INDIVIDUAL L, who is MARCON's girlfriend, and the lessee of **Subject Premises 8** according to Stadium Drive Apartments records.

229.    As described in Paragraph 243, on August 9, 2018, after a suspected drug transaction, the GPS tracker information showed BAGLEY traveled to the area near **Subject Premises 8**.  After a little while, the Equinox traveled from **Subject Premises 8** to **Subject Premises 9**.

230.    On August 14, 2018, investigators observed MARCON coming and going from the entrance of **Subject Premises 8**.

### I.      Subject Premises 9: 5175 Collingwood Avenue, Kalamazoo, Michigan (ANDREW BAGLEY's residence)

231.    As set forth in Attachment A for the Application for a search warrant for 5175 Collingwood Avenue, Kalamazoo, Michigan 49004, the property to be searched is commonly known as 5175 Collingwood Avenue, Kalamazoo, County of Kalamazoo, State of Michigan. The primary structure on **Subject Premises 9** is an off-white single story, single family dwelling with an attached garage on the south side of the residence.  The residence sits on the west side of the road.  There is dark brown trim around the windows and black shingles.  Additionally, there

is a storm door in front of the main door that faces east.  The numbers "5175" are affixed to the storm door in the middle of the door and are black in color.

232.    During the investigation, BAGLEY had been surveilled meeting with other members of the DTO on nearly a dozen occasions at the Crow's Nest.  On a at least three of those occasions, investigators have followed BAGLEY back to **Subject Premises 9**, physically or through the use of a GPS tracking device on BAGLEY's Equinox.

233.    On July 31, 2018, at approximately 8:16 p.m., a call (Session #4894) was intercepted between JAMES, using **TARGET PHONE 1**, and BAGLEY, using phone number (269) 303-9591.  During the call, JAMES asked BAGLEY if he was at the Crow's Nest and how much he wanted.  BAGLEY's response was, "The qp bro."

234.    Based on my training, experience and knowledge of the investigation, I believe that BAGLEY is asking JAMES for a quarter pound of crystal methamphetamine, when he said "The qp bro."

235.    At approximately 8:18 p.m., investigators observed BAGLEY's gray Chevrolet Equinox drive into the rear parking lot of the Crow's Nest and park on the north side of the parking lot.

236.    On July 31, 2018, at approximately 8:23 p.m. investigators observed BAGLEY on a cellular phone.  At the same time, investigators intercepted a call (Session #4895) between BAGLEY, using phone number (269) 303-9591 and JAMES, on **TARGET PHONE 1**.  During the call, BAGLEY said, "Yeah, I'm ova . . . I'm over here where I normally park but like ummm one up because there are a lot of cars.  I ain't got no parking spot against the fence."  JAMES said, "Alright.  [U/I] on the like coming towards the back.  I'm in a . . . I'm in a white uhh what's this?  I'm in a white Chrysler bro."

237.    At approximately 8:24 p.m., investigators observed BAGLEY exit the parking space he was parked in and move south down the lot.  At approximately 8:26 p.m., investigators observed BAGLEY's Equinox back into a parking space, with its headlights on, about nine parking spaces to the south of where he had been parked in the Crow's Nest parking lot.  Across from the Equinox was a white car with its headlights on.

238.    At approximately 8:27 p.m., investigators observed BAGLEY, wearing a white t-shirt and black pants, walk from the area of the white car and enter back into the driver door of the Equinox.  BAGLEY then left the parking lot southbound in the Equinox.

239.    At approximately 9:07 p.m., investigators followed BAGLEY in the gray Equinox and observed BAGLEY park in the driveway of **Subject Premises 9**.

240.    On August 9, 2018, at approximately 5:33 p.m., BAGLEY, using phone number (269) 303-9591, contacted (Session #5832) JAMES, on **TARGET PHONE 1**.  Below is an excerpt of the call.

| | |
|---|---|
| JAMES: | Shit, what you tryin to do? |
| BAGLEY: | Uhh, shit, I don't know if you good I'll take a QP and give you what I got and then come back uhh, tonight or tomorrow. |
| JAMES: | Alright, you call me when you come through. |

241.    Based on my training, experience, and knowledge of the investigation, I believe that when BAGLEY said, "I'll take a QP and give you what I got and then come back uhh, tonight or tomorrow,"  BAGLEY was saying that he wanted a quarter pound of crystal methamphetamine and that he would give JAMES the money later.

242.    At approximately 5:43 p.m., the GPS tracker on BAGLEY's Equinox, placed pursuant to a warrant, indicated that it was at **Subject Premises 2** for approximately 20 minutes.

At approximately 6:04 p.m., BAGLEY's Equinox arrived at the Crow's Nest parking lot and BAGLEY notified JAMES he was there.

243.    After a short time, BAGLEY's Equinox left the Crow's Nest and traveled directly to the area near **Subject Premises 8**.  BAGLEY's Equinox stayed at the area around the **Subject Premises 8** for approximately 30 minutes then traveled to **Subject Premise 9**.

244.    Since placing the GPS tracking device onto BAGLEY's gray Equinox on August 6, 2018, investigators have reviewed the track of the vehicle and almost every night the tracker on the Equinox was located at **Subject Premises 9**.

### J.    Subject Premises 10: 744 Liberty Street, Apartment # C1, Kalamazoo, Michigan (KANDY KIRBY's residence)

245.    As set forth in Attachment A for the Application for a search warrant for 744 Liberty Street, Apartment #C1, Kalamazoo, Michigan 49008, the property to be searched is commonly known as 744 Liberty Street, Apartment #C1, City of Kalamazoo, County of Kalamazoo, State of Michigan.  The primary structure on **Subject Premises 10** is a light beige three story, multi-family apartment building with vinyl siding.  The apartment building sits on the north side of the road and four structures to the east of Duke Street.  There is white trim around the building and the windows and black shingles.  Additionally, the main entry door of the building is on the east facing wall.  The numbers "744" are affixed to the corner of the south facing wall about 1/3 of the way up from the ground on the building and are black in color.

246.    Since July 3, 2018, KIRBY has conducted dozens of suspected methamphetamine transactions with JAMES.  On at least two occasions, investigators have conducted surveillance on KIRBY back to **Subject Premises 10**.  Additionally, investigators have made two controlled purchase of crystal methamphetamine from KIRBY at **Subject Premises 10**.

247.    On July 10, 2018, at approximately 5:16 p.m., KIRBY, using (269) 348-6323,

made contact (Session #1184) with JAMES, on **TARGET PHONE 1**.  Below is an excerpt of

the call:

| | |
|---|---|
| JAMES: | Na, whats goin on doe. |
| KIRBY: | I need something? |

248.    Based on my training, experience, and knowledge of the investigation, I believe

that KIRBY asked JAMES for an unspecified amount of crystal methamphetamine.

249.    At approximately 5:40 p.m., KIRBY, using (269) 348-6323, made contact

(Session #1192) with JAMES, on **TARGET PHONE 1**.  Below is an excerpt of the call:

| | |
|---|---|
| JAMES: | I haven't had a chance, I'm call you when I make it to the spot, I got to see what's there, I'm call you back. |
| KIRBY: | Oh ok, alright. |

250.    Based on my training, experience, and knowledge of the investigation, I believe

when JAMES said, "I'm call you when I make it to the spot, I got to see what's there," JAMES

meant that he was not sure how much crystal methamphetamine he had left, but once he made it

to 922 S. Park Street, he would be able to tell her.

251.    At approximately 6:06 p.m., investigators observed KIRBY leaving out of the

back door of 922 S. Park Street after being inside for approximately five minutes.  At

approximately 6:07 p.m., investigators observed a gray 2003 Cadillac Deville sedan leave 922 S.

Park Street with KIRBY as the driver.

252.    Investigators followed KIRBY in the gray Cadillac to the apartment complex at

**Subject Premises 10**.  KIRBY parked in front of the building, but was not observed exiting the

vehicle.  Surveillance was terminated.

253.    On August 9, 2018, KVET conducted a controlled purchase from KIRBY at

**Subject Premises 10**.  A KVET confidential informant (hereinafter KVET CI#2)[26] attempted to

make contact with a man from which he or she believed methamphetamine could be purchased,

dialing (269) 220-2744, but the informant reached KANDY KIRBY instead.  KIRBY told the

KVET CI#2 that she knew what he or she wanted and he or she could come over to **Subject**

**Premises 10** to purchase the methamphetamine.

254.    KVET CI#2 was followed by investigators to **Subject Premises 10** and officers

maintained surveillance on the target location.  KVET CI#2's handlers searched him or her for

contraband, and located no controlled substances, weapons, or money.  Investigators then

observed KVET CI#2 enter and then exit the Liberty Street apartment building and followed him

or her back to a pre-designated location.  KVET CI#2 turned over the purchased

methamphetamine.  KVET CI#2 was searched again, with no other controlled substances,

weapons, or money located.  KVET CI#2 said that the man he or she originally tried to contact

was inside the apartment building and directed him or her to his girl in apartment C1 to purchase

the methamphetamine.  KVET CI#2 then went to apartment C1 and was let into the apartment by

KIRBY.  KIRBY provided the crystal methamphetamine to KVET CI#2 and he or she left the

---

[26] KVET CI#2 has provided information to investigators since June 2018.  KVET CI#2 has been providing the information in the hope of receiving consideration for charges involving delivery of cocaine, greater than 50 grams.  The information provided by KVET CI#2 was fact-checked by investigators and proved to be accurate through database checks, information provided by other confidential informants, and intelligence contained in police files. Investigators have consistently found KVET CI#2's information to be reliable.  KVET CI#2 has conducted an additional successful controlled purchase operation with KVET subsequent to the buy described here.  While utilizing KVET CI#2, KVET has not had any issues with his or her credibility or performance.

apartment.  KVET CI#2 was shown a photograph of KIRBY and confirmed that she was the person who delivered the methamphetamine.

255.    On August 21, 2018, investigators conducted another controlled purchase of approximately 3.5 grams of suspected crystal methamphetamine from KIRBY at **Subject Premises 10**, again utilizing KVET CI#2.  Prior to the controlled purchase, KVET CI#2's handlers searched him or her for contraband, and located no controlled substances, weapons, or money.  KVET CI#2 was then surveilled to **Subject Premises 10** and investigators observed KVET CI#2 walk into the doorway of apartment C1, where KIRBY subsequently delivered the methamphetamine to KVET CI#2.  Investigators then observed KVET CI#2 leave the Liberty Street apartment building and followed him or her back to a pre-designated location.  KVET CI#2 turned over the purchased methamphetamine.

### K.    Subject Premises 11: 556 Sherman Court, Benton Harbor, Michigan (RAYMOND STOVALL's residence)

256.    As set forth in Attachment A for the Application for a search warrant for 556 Sherman Court, Benton Harbor, Michigan 49022, the property to be searched ("**Subject Premises 11**") is commonly known as 556 Sherman Court, City of Benton Harbor, County of Berrien, State of Michigan.  **Subject Premises 11** is further described as a single-story, single family home with beige vinyl siding and black trim, with a black asphalt shingle roof.  The front door is white and the address numbers are affixed on the left side of the front door.  It is further described as the last residence on the west side of Sherman Court at the southern dead end.

257.    **Subject Premises 11** is the primary residence of RAYMOND STOVALL. While he does spend time at **Subject Premises 1** when he is in Kalamazoo, Michigan, he has spent far more time at **Subject Premises 11** in the past month according to cell phone location

information obtained pursuant to a warrant. **Subject Premises 11** is also the residence of Nancy Stovall, STOVALL's mother. STOVALL's address of record with the Michigan Secretary of State is **Subject Premises 11.**

258. As detailed in Paragraphs 127 through 137, on August 21, 2018, investigators suspect that methamphetamine was transported from **Subject Premises 11** to **Subject Premises 1**. JAMES was in Benton Harbor on that date and began communicating to multiple co-conspirators that he had come into possession of some high quality methamphetamine. JAMES was subsequently observed driving away from **Subject Premises 11** with INDIVIDUAL J and was surveilled to **Subject Premises 1**, into which he entered carrying a large plastic bag. Shortly after his arrival, JAMES distributed at least one pound of methamphetamine to BRAXTON and D. HORN from **Subject Premises 1**.

259. Investigators have also established evidence that STOVALL illegally possesses firearms, and likely maintains a firearm at his residence, **Subject Premises 11**. STOVALL is a convicted felon and prohibited from possessing a firearm. In July 2018, he posted a picture to his publicly available Facebook account with what investigators believed to be a semi-automatic pistol sticking out of his pocket. As referenced in Paragraphs 125 and 126, on August 17, 2018, STOVALL and JAMES also discussed the location of two firearms that were removed from **Subject Premises 1**.

260. Additionally, on August 13, 2018, at approximately 10:42 p.m., STOVALL, using **TARGET PHONE 2**, had a conversation (Session #303) with an unidentified female ("UF 1344"), using (269) 338-1344. Below is an excerpt of the conversation:

UF 1344:          When you coming?

103

| | |
|---|---|
| STOVALL: | I'll come in-I'll come in like 5 or 10 minutes.  I'm right- I'm finna walk through. I'm finna walk right there. |
| UF 1344: | Alright. Bet. |
| STOVALL: | I don't need my pistol, do I? |
| UF 1344: | Nah. |
| STOVALL: | [U/I] I don't want-I don't want no body to come at me and start acting crazy. I'ma have to kill 'em. |
| UF 1344: | Nah.  Nah.  He won't be doing that. |
| STOVALL: | Ah, alright. |
| UF 1344: | Bet. |
| STOVALL: | I'ma call you when I'm in the alley. |

261.    Based on my training, experience, and knowledge of the investigation, I believe STOVALL was asking UF 1344 if he needed to carry his pistol on him when he came to meet with her.  He said "my pistol," which indicates he has a specific pistol that he keeps with him on a consistent basis.  Finally, when he said he will call her once he is "in the alley," he meant he would call her when he is at **Subject Premises 11**.  Throughout his intercepted communications, STOVALL has consistently referred to **Subject Premises 11** as "the alley."  This is likely because Sherman Court, where **Subject Premises 11** is located, is a very narrow, dead-end alley.

## IV.    Conclusion

262.    Based on the foregoing, I respectfully submit there is probable cause to believe RAYMOND DEMETRIUS STOVALL, a/k/a "OG," RICHARD LEE JAMES JR., a/k/a "Lopez," a/k/a "Blow Pack," a/k/a "Cheese," a/k/a "Blow Cheese," KENTRELL TEROME DUNN, a/k/a "Squeeze," a/k/a "Teddy," DAVID RICHARD UMINN, ANDREW PETER BAGLEY, ROBERT BRUCE ARMSTRONG, KANDY KAY KIRBY, ESHAWN JAMIER

WHITESIDE, a/k/a "Boont," a/k/a "Boontha," AARON EARL RIMPSON, DEMICHAEL MISHAUN HORN, a/k/a "D-Mike," MICHAEL DEWAYNE HORN, a/k/a "Benji," SCOTTY DEANDRE-MARCUS CAMPBELL, RONALD EUGENE GOODLOE JR., a/k/a "Rocky," a/k/a "Rock Star," RICHARD FARMER SR., DAISY LAVERNE DYER,  MICHAEL JOHN MARCON, a/k/a "Mikey," RONNIE DEVAL SMITH JR., a/k/a "Nun," a/k/a "Nun Nun," and TREMAIN LAMAR BRAXTON, a/k/a "Smile Dog," have conspired and are conspiring to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 846, and I therefore request arrest warrants for each of them.  I further respectfully submit there is probable cause to believe evidence, contraband, fruits of the crime, and instrumentalities of the conspiracy are located at each of the **Subject Premises**, and I therefore request a search warrant for each of the locations, as described in the respective Attachments A, for the items described in Attachment B.

263.    Further, I further request that the Court order all documents in support of this complaint and these applications, including the continuation and search warrants, be sealed until further ordered by the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

## Page Index

ARMSTRONG, 4, 5, 42, 45, 46, 64, 65, 81, 82, 83, 84, 104

BAGLEY, 4, 6, 37, 38, 42, 44, 46, 47, 69, 95, 96, 97, 98, 99, 104

BRAXTON, 4, 67, 70, 71, 103, 105

CAMPBELL, 4, 36, 37, 38, 41, 42, 105

DUNN, 3, 4, 16, 17, 33, 34, 35, 38, 39, 40, 41, 46, 49, 54, 55, 72, 73, 74, 104

DYER, 4, 15, 16, 20, 27, 30, 31, 52, 85, 105

FARMER, 4, 32, 33, 39, 40, 74, 75, 76, 105

GOODLOE, 4, 26, 35, 36, 85, 86, 105

HORN, D., 4, 25, 26, 27, 56, 57, 58, 67, 71, 103, 105

HORN, M., 4, 43, 44

JAMES, 3, 4, 5, 11, 12, 13, 15, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 35, 36, 37, 38, 43, 44, 47, 53, 56, 58, 60, 62, 63, 64, 66, 67, 68, 69, 70, 71, 72, 73, 74, 77, 78, 79, 80, 81, 84, 85, 86, 90, 91, 92, 93, 95, 97, 98, 99, 100, 103, 104

KIRBY, 4, 6, 12, 13, 68, 69, 99, 100, 101, 102, 104

MARCON, 4, 6, 37, 47, 94, 95, 96, 105

RIMPSON, 4, 6, 13, 14, 90, 91, 92, 93, 94, 105

SMITH, 4, 56, 57, 58, 59, 60, 105

STOVALL, 3, 4, 6, 11, 12, 13, 14, 15, 16, 17, 20, 25, 26, 31, 32, 33, 34, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 65, 66, 67, 70, 77, 78, 80, 82, 83, 84, 85, 88, 91, 95, 102, 103, 104

UMINN, 4, 5, 42, 43, 44, 77, 78, 79, 80, 81, 104

WHITESIDE, 4, 6, 15, 26, 29, 40, 41, 46, 48, 49, 50, 53, 54, 55, 67, 87, 88, 89, 90, 105